PERDUE, INC. *v.* STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

[No. 132, September Term, 1971.]

*Decided January 18, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*K. Donald Proctor* and *Robert L. Karwacki* for appellant.

*Amicus Curiae* brief filed by Delmarva Poultry Industry, *Hearne, Fox & Bailey* and *Charles E. Hearne, Jr.,* on the brief.

*E. Stephen Derby, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

This case adds new monetary dimensions to that time-worn maxim "don't count your chickens before they hatch" for here the validity of a $183,870.00 tax assessment hinges on the supposition that an egg is an egg and not a chicken. This dispute arose when the State Department of Assessment and Taxation, appellee, levied a tax against Perdue, Inc., appellant, on its average inventory of hatchery eggs during the year 1969. Appellant objected to this levy claiming statutory exemptions because these eggs are "poultry," and the "raw materials of a manufacturer." When the tax department made this assessment final, Perdue sought relief, though unsuccessfully, first from the Maryland Tax Court and later in the

Circuit Court for Wicomico County. It then appealed to this Court but to no avail for we conclude the assessment is proper.

The testimony at the hearing in the Tax Court established that Perdue is a Maryland corporation operating principally in Wicomico County where it is engaged in the business of breeding and raising broiler chickens for sale to processing plants. Its completely integrated operation consists of all necessary steps in the breeding and raising cycle. This cycle begins with the purchase of breeder hens when they are day-old chicks. For the next ten to twelve weeks, these chicks are raised on brooding farms which though privately owned work under contract for Perdue. The chicks are then placed on privately owned farms where they are reared for appellant. When the hens mature, and natural fertilization takes place, they begin to lay eggs which are gathered by the contract farmer and put in coolers, chilled to a temperature of 60-65 degrees, in order to arrest embryonic development. Usually within two or three days the eggs are delivered to Perdue's hatcheries where they may remain chilled for a few more days before being placed in incubators. Once there, the fertilized egg resumes its development and hatches in about three weeks. Perdue's many hatcheries all contain a receiving room, an incubation area, and a dispatching room. Each incubator is a large box-type oven that accommodates about 60,000 eggs. They are designed to simulate the natural conditions necessary for hatching by controlling ventilation, humidity and maintaining the temperature at 99½ to 100 degrees. On any given day there are about two and a half million eggs in incubation of which about 80% eventually hatch, producing 800,000 new chicks a week.[1] When the chicks are ready to hatch they, after pecking a hole, "kick their way out of the shell", and are then sent to the dispatching room where they are put in boxes for shipment to contract growing farms. Here, as on the brooding and

---

1. The 20% that do not hatch are incinerated.

rearing farms, title to the poultry always remains with Perdue. The broilers are kept on the grower farms for eight or nine weeks until they weigh approximately four pounds and are then sold to processing plants to be prepared for the consumer market, eventually to end up adorning someone's dinner table.

We will first consider appellant's contention that these eggs constitute poultry within the meaning of the Maryland Code (1957, 1969 Repl. Vol.) Art. 81, § 9 (38) which exempts "all poultry" from state, city, and county taxation. The parties agree that the chick, once it emerges from the egg, is exempt poultry. But, appellant analogizes this situation with fertilized eggs in various stages of embryonic development and argues that these are also exempt since they are living organisms. This analysis is premised on the belief that the ordinary meaning of the word poultry, as used in this statute, was intended by the Legislature to include appellant's inventory of hatchery eggs. Appellant requests in its brief that we read the exemption *"all* poultry" to embrace "all domestic birds in *all* their forms, [including eggs]." We decline the invitation to place such an unnatural construction on this statutory language.

Before discussing the specific language employed here we must initially consider the general rules governing the construction of any tax exemption law. To determine the applicability of a legislative exemption to particular facts it is necessary to ascertain whether the language of the act clearly and unambiguously included the claimed items by words used in their ordinary and popularly understood meaning. A court cannot extend the scope of an exemption by giving to the language creating it a forced, strained, and unnatural construction. *Pressman v. Barnes,* 209 Md. 544, 558, 121 A. 2d 816 (1956) ; *State Tax Comm. v. Block & Tile Co.,* 180 Md. 620, 26 A. 2d 371 (1942).

It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and

if any real doubt exists as to the propriety of an exemption that doubt *must* be resolved in favor of the State. In other words, "to doubt an exemption is to deny it." *Pan Am Sulphur v. State Dep't,* 251 Md. 620, 629, 248 A. 2d 354 (1968) ; *Macke Co. v. State Dep't of Assessments and Taxation,* 264 Md. 121, 285 A. 2d 593 (1972). *Suburban, etc. Gas Corp. v. Tawes,* 205 Md. 83, 87, 106 A. 2d 119 (1954) ; *Pittman v. Housing Authority,* 180 Md. 457, 460, 25 A. 2d 466 (1942). In addition the Legislature has explicitly stipulated in § 9 of Art. 81 that all exemptions are to be strictly construed. Furthermore, the State's taxing prerogative is never presumed to be relinquished and the abandonment of this power must be proved by the party asserting the exemption. *Std. Properties v. Emp. Security Bd.,* 201 Md. 1, 8, 92 A. 2d 459 (1952) ; *Knights of Pythias v. Baltimore,* 157 Md. 542, 549, 146 A. 744 (1929) and cases cited therein.

In order to benefit from the "all poultry" exemption of § 9 (38) Perdue must establish that the General Assembly intended the word poultry, in its popular, non-scientific or technical meaning, to include eggs before they hatch. We have digested many definitions of the word "poultry" and in none is an "egg" included within the boundaries of its meaning. On the contrary, eggs are normally considered to be a product of poultry. An interpretation of the term poultry accepted by the parties here and adopted by the Maryland Tax Court is:

> "Domestic fowls, generally or collectively, reared for the table or for their eggs or feathers, as hens, ducks, geese and turkeys, specif., a number of domestic hens." *Funk & Wagnalls New Standard Dictionary of the English Language,* Funk & Wagnalls Co. (1959). *See also Webster's Third New International Dictionary* (1961) ; *The Oxford English Dictionary—Volume VII,* Oxford (1933).

An egg according to *Webster's New International Dictionary* (2d Ed. 1959) is:

> "The oval or spheroidal reproductive body produced by birds and many reptiles, from which, after a period of incubation or development, the young hatches out; esp., in common usage, that of the domestic hen. . . ."

These explanations make it clear that eggs and poultry are separate and distinct from each other. As popularly regarded, an egg is an egg regardless of embryonic development until hatched, at which time the newborn chick is poultry. *James P. Smith & Co. v. United States,* 168 F. 462 (S.D.N.Y. 1909); *Town of Wolcott v. Stickles,* 85 Conn. 322, 82 A. 572 (1912). If this exemption is to be expanded it cannot be accomplished by judicial fiat but instead must be achieved through legislation.[2]

In a further effort to obtain an exemption Perdue relies on *Armco Steel v. State Tax Comm.,* 221 Md. 33, 41, 155 A. 2d 678 (1959) and uses the following language as its sword:

> "In construing the language of a statute, the court must consider not only the literal or usual meaning of words, but their meaning and effect considered in the light of the nature of the subject matter and the purposes to be accomplished. . . . When terms in a statute are used relating to trade or commerce, absent legislative intent to the contrary, the terms are presumed to be used in their trade or commercial meaning." (Citations omitted.)

Thus appellant says, in accepting *arguendo* that hatchery eggs are not poultry as the term is popularly used, the

---

2. The Legislature frequently grants new exemptions and modifies old ones. In fact the present exemption created by Ch. 551, Laws of Maryland 1966 amended Ch. 755, Laws of Maryland 1953. The old law provided that "*all young poultry* including chickens, ducks, turkeys, and guineas, not more than six months of age and not kept for reproductive purposes" were exempt (emphasis added). We do not think eggs are included under either of these laws but assuming appellant is correct in stating that eggs are exempt under the new act, then to be consistent Perdue should have claimed exemption under the old. Surely if eggs qualify as poultry then they should also qualify as young poultry less than six months old.

exemption is directed at the poultry industry and must be viewed in its trade or commercial meaning which includes hatchery eggs. Any dependence on that case is misplaced. The lesson of *Armco* is that only when the language or terminology used in a statute is unclear or ambiguous may the court construe its meaning by resorting to evidence of custom or usage in light of the legislative intent and purpose. *Atlantic, Gulf v. Dep't of Assess. & T.*, 252 Md. 173, 249 A. 2d 180 (1969) ; *Hunt v. Montgomery County*, 248 Md. 403, 237 A. 2d 35 (1968). The holding in *Armco* clearly supports the position we take here. The word "poultry" is neither unclear nor ambiguous and therefore unlike the Court in *Armco* we are prohibited from "construing the language of a statute." We conclude that Perdue's eggs are not exempt under § 9 (38).

We next turn to the admittedly less substantial issue of manufacturing. Article 81, § 9 (24) enables a city and/or county to pass local laws or resolutions exempting the "raw materials of a manufacturer" from local but not state taxation. Wicomico County, where appellant's operations are based, exercised this delegated power and provided for a 100% exemption.[3] To be eligible for this exemption Perdue's eggs must meet the requirement of being the "raw materials of a manufacturer." In determining if appellant meets this criterion we are governed generally by the same legal principles that guided us in our consideration of what was included in the "all poultry" exemption. As before, this exemption must also be strictly construed and the burden is on the appellant to prove that the normal meaning of the words authorizing the exemption embraces its operations. *Webster's New International Dictionary* (2d Ed. 1959) defines manufacture as:

> "To make by hand, by machinery, or by other agency; as to *manufacture* cloth, nails, glass,

---

3. The County first passed a resolution effective January 1, 1941 granting this exemption to continue for ten years. It has since been renewed each subsequent decade.

etc.; to produce by labor, esp. now, according to an organized plan and with division of labor and usually with machinery."

Another definition was approved in *Arnreich v. State,* 150 Md. 91, 132 A. 430 (1926) where the Court said manufacturing is:

"the application to material of labor or skill whereby the original article is changed to a new, different and useful article, provided the process is of a kind popularly regarded as manufacture."

Therefore, if a new article emerges through the utilization of ingenuity and labor this constitutes manufacturing and is then exempt provided the ordinary person regards this process to be manufacturing. *State Tax Comm. v. Block & Tile Co.,* 180 Md. 620, 26 A. 2d 371 (1942); *Elec. Light Co. v. Frederick City,* 84 Md. 599, 601 (1897).

While the term manufacture as used in the statute is a plain everyday word, it is frequently difficult to state with complete precision whether an activity is manufacturing or some other process; this determination depends on the facts and circumstances present in each particular case. *Baltimore v. Hanover Shirt Co.,* 168 Md. 174, 180, 177 A. 160 (1935); *H. M. Rowe Co. v. Tax Commission,* 149 Md. 251, 258, 131 A. 509 (1925); *Carroll County v. Shriver Co.,* 146 Md. 412, 417, 126 A. 71 (1924). A comparative examination of the cases in this State which have considered manufacturing exemptions indicates a consistency in the application of that term to specific operations. This Court has heretofore found the following to be manufacturing: running a flour mill, *Carlin v. West. Assurance Co.,* 57 Md. 515 (1882); operating a canning factory, *Carroll County v. Shriver Co., supra;* cutting the large hulls of steel vessels into sections that had a commercial use, *Baltimore v. Tax Commission,* 161 Md. 234, 155 A. 789 (1931); making shirts

except for being sent out for sewing by an independent contractor, *Baltimore v. Hanover Shirt Co., supra;* and operating a job printing plant, *Tax Comm. v. Standard Oil Co.,* 181 Md. 637, 31 A. 2d 621 (1943) and *American Newspapers v. Tax Commn.,* 174 Md. 56, 197 A. 574 (1938). On the other hand, this Court has determined that manufacturing is not involved in these processes: using gas mains for the distribution of gas and gasometers for storage, *Suburban, etc. Gas Co. v. Tawes,* 205 Md. 83, 106 A. 2d 119 (1954) ; *Consolidated Gas Co. v. Baltimore,* 62 Md. 588 (1888) ; operating an electric light plant, *Elec. Light Co. v. Frederick City, supra;* publishing, which merely consists of composing and arranging the contents and form of books printed by independent contractors, *H. M. Rowe Co. v. Tax Commission, supra;* cleaning fish for sale, or cutting carcasses of animals into parts suitable for sale, *Arnreich v. State, supra;* and hauling an asphalt mixture to street construction sites (although equipment used to produce the mixture was exempt), *State Tax Comm. v. Block & Tile Co., supra.*

While the line of demarcation between manufactured and non-manufactured products may at times be rather indistinct, the determinative factor appears to be whether a product has gone through a substantial transformation in form and uses from its original state. And this includes practically all *artificial* products of human industry. *Carlin v. West. Assurance Co., supra.* In light of these requirements, we do not think appellant's operations are manufacturing.

Perdue, whose business is raising and breeding broiler chickens, contends that the portion of its operation involving the artificial incubation of eggs is a manufacturing procedure with the eggs as "raw materials" and consequently they are exempt from county taxes. Incubation is defined as:

"to sit upon (eggs) to hatch them by the

warmth of the body, as most birds do, to brood, hence to maintain (eggs, embryos of animals, bacteria, or the like) under prescribed and usually controlled conditions of temperature, moisture, etc., favorable for hatching or development." *Webster's New International Dictionary* (2d Ed. 1959).

Here, appellant simply takes a naturally fertilized egg which has the capacity of life and places it in an environment conducive to further development. To suggest as appellant does that it manufactures eggs or chickens is to disregard the rather essential part the hen and rooster play. These are the protagonists that cause the substantial transformation from egg to chick, not Perdue which merely places the eggs in an area most suitable for permitting nature to take its course. In the present state of man's technology we cannot accept the notion that manufacturing can ever occur when the end product is a living organism. While one step in Perdue's operation is incubation this is not coterminous with manufacturing. To the average person a chicken is hatched from an egg, it is not manufactured. Certainly no one would contend that sowing tomato seeds in a hot house, where the temperature and moisture are mechanically controlled until the plant matures, constitutes the manufacturing of a tomato. The same conclusion must apply to eggs artificially incubating in a hatchery.

In a final attempt to secure this exemption appellant asks us to adopt the reasoning of the Supreme Court of Ohio in *Miller v. Peck,* 158 Ohio St. 17, 106 N.E.2d 776 (1952). That court held mechanical incubators to be tools and implements of a manufacturer entitled to an exemption. However, in Ohio there is an expansive statutory definition of manufacturing which reads:

"A person who purchases, receives or holds personal property, of any description, for the purpose of adding to the value thereof by manufacturing, refining, rectifying, or by the combi-

nation of different materials with a view of making a gain or profit by so doing, is a manufacturer * * *." (§ 5385 Ohio General Code)

In view of this statute, the court said that the commercial transformation of personal property, using tools and machinery, into other more valuable items of personal property constituted manufacturing and accordingly held that the incubation of eggs, as a business enterprise, was a manufacturing operation. This Ohio decision is of no aid to appellant since it is based on a statutory test not employed in Maryland.

Perdue has not sustained its burden of proving that the appropriate taxing authority has relinquished the ability to tax these eggs. Nothing appellant advances would justify our disturbing this assessment.

*Order affirmed. Costs to be paid by the appellant.*