# PERDUE FOODS, INC. *v.* STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

[No. 238, September Term, 1971.]

*Decided March 8, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*K. Donald Proctor* and *Robert L. Karwacki* for appellant.

*Amicus Curiae* brief filed by Delmarva Poultry Industry, *Charles E. Hearne, Jr.,* and *Hearne, Fox & Bailey* on the brief.

*E. Stephen Derby, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here reverse an order of the Maryland Tax Court which held that a chicken processing plant was not engaged in manufacturing so as to bring it within the tax exemption provided in Code (1957, 1969 Repl. Vol.) Art. 81, §§ 9 (23) and 9 (24). Appellant, Perdue Foods, Inc., (Perdue), objects to a determination by appellee, State Department of Assessments and Taxation (the department), denying it an exemption on its 1969 tangible personal property tax return.

Perdue operates what it described as "a fully integrated operation in Wicomico County in which chickens are processed for market." It was testified that Perdue's was one of nine such plants operated in the counties of Talbot, Caroline, Wicomico, and Worcester employing between 3600 and 3800 people.[1]

The Perdue plant covers most of a city block in Salisbury, being approximately 100,000 square feet in area. It employed approximately 700 people, working on two shifts, at the end of the year 1969. Its machinery and equipment represent an investment in excess of $800,000.

---

1. This number has been reduced to seven since that time by the closing of the Wilson plants at Denton and Federalsburg in Caroline County. The Federalsburg plant has been sold for conversion into non-poultry uses.

Perdue presented an expert witness, Ernest Matthews, a representative of Delmarva Poultry Industry. His associations with the broiler industry included growing broilers beginning in 1936, continuing through the operation of his own processing plant at Laurel, Delaware, until 1963, and the management of the plant now operated by Perdue when it was owned by Swift and Company. He said that "as counsel for the processors' committee of the Delmarva Poultry Industry" he was "in the plant frequently," with there seldom being a month in which he was not there. The witness had helped to develop the blueprints for remodeling of the plant after it was acquired by Perdue from Swift in June, 1967. He was familiar with this and 14 other processing plants on the Delmarva Peninsula.

Matthews described the evolution which has taken place in the broiler industry.[2] In the early days poultry was sold live and one had his own butcher kill it or "took it home and killed it." As Mr. Matthews put it:

> "Volume [production] required something else. So they kosher-killed, which we refer to, by slitting the jugular vein—it was the acceptable move in going to [fresh killed chickens]—in particular with the kosher trade—[most operations in the poultry market area] actually had the rabbi do the killing. The demand for this type of poultry grew in addition to the kosher business. So we had New York dress plants, so called, because that's where the de-

---

2. It has no bearing on the decision in this case and is not a part of the record, but it is a fact that the broiler industry in the United States began on the Delmarva Peninsula. Various competitive advantages have resulted in greater expansion in other states. Other broiler producing areas now produce approximately 90% of the nation's supply. In the years immediately subsequent to World War II, Main Street in Selbyville, Delaware, a town situated immediately north of the Maryland-Delaware state line, was referred to by some as "the Wall Street of the chicken world." The 1969-70 edition of Maryland Manual lists Maryland's total farm receipts for the year 1966 at $338,044,000, stating that "poultry and poultry products" comprised $106,301,000 of this total. This compares with a total for all crops of $106,423,000.

mand originally grew from. The New York dress is simply—kill them, take the feathers off, chill them—and here you have to still come below the 40 degrees in order to remove the body temperature—but chill them and ship them feet intact, head intact, and the viscera intact."

The Perdue plant processes approximately 12,000 chickens per hour. This begins when a truck picks up live chickens from broiler houses and brings them to the plant. By use of an electro-magnetic device 12 coops at a time are removed from each truck.[3] Live chickens are hung by their feet on two mechanized conveyor lines which convey them through each of the various steps in the production cycle. They are automatically killed. Then they go through a blood tunnel for bleeding. The blood is accumulated for purposes of pollution control, and processed for animal feed and fertilizer. They enter what is called a "scalder" where water at a temperature of 127 degrees is applied to help remove the feathers. The chickens then move to a series of picking machines. Mr. Matthews said of these, "[T]here are no employees other than a maintenance man [in the picking area]. This is a completely separate area, entirely mechanized."[4] In another area the surplus feathers are washed off the chickens with water which has been chlorinated in order to remove bacteria from the skin. This stream of cool water is also intended to start reducing the temperature of the chicken from its live temperature of 105 degrees. Feet are cut off automatically. The chickens then drop onto a conveyor belt which carries them to another point where they are rehung by their hocks on yet another automatic conveyor line. At that point employees called "pinners" proceed to remove "the few pin feathers that

3. Mr. Matthews described this device as "unique with the Perdue operation as no other plant on the [Eastern] Shore has this."
4. The feathers are collected through screens and carried to a plant where they are processed for protein supplement to animal feed, Mr. Matthews indicated.

may be left on some individual chicken," there being employed two to ten people depending on the size of the operation. Mr. Matthews said, "The machine gets them 99% plus clean."

The birds, as Mr. Matthews often referred to them, enter the eviscerating room by four separate conveyor lines. A water flush trough runs under the conveyor line to catch and carry away the inedible material or offal. This is sold to a rendering plant. The oil sac is first cut off the tail of each chicken. The abdominal cavity, is opened with a knife. The viscera are pulled out and hung "in a particular position on the hip of the bird" in order that Federal inspectors may inspect them while they are attached to the chicken. "He can see into the body cavity of the bird and see the viscera [at the same time]." There are two Federal inspectors "on each line." "Each bird is inspected for wholesomeness and any bruises or damage to the bird has to be trimmed off." Any birds which the veterinarian wishes to examine more closely are removed from the line in order to provide him that opportunity. The gizzards and liver are removed from the carcasses manually. The gall is trimmed from the liver. The livers then go "into a water flush trough that carries them into a chilling system and salvaged to be rewrapped and put in the birds later." The gizzards are put "in a mechanical gizzard cutter." It has an inverted blade that cuts them from the underneath side. Water flushes all the grit and waste out of the gizzards. They, too, are wrapped and placed with the liver in the abdominal cavity of a chicken, but not necessarily in the chicken from which they were removed. The necks then "are cut off automatically." After the head is removed the necks are also returned to the abdominal cavity. After the neck is removed "a big vacuum lung-gun machine * * * goes in and sucks out the lungs." The lungs are automatically carried by vacuum to a point where they "join the other offal products that are going to the rendering plant. They are never touched by hand."

From that point the chickens are moved to a "chilling

operation." Mr. Matthews said, "These birds are dropped from automatic trip shackles into the ice water brine and carried through the length of the chilling system so that when they come out the other end some 20 to 30 minutes later they will be at a temperature—well, they must be at a temperature of less than 40 degrees. In this particular operation, they require that it be less than 35 degrees." From this point the chickens pass onto a conveyor line for grading where tags identifying the grade are placed on a wing of each chicken. They then pass on the conveyor belt to a sizer which automatically sorts the chickens by size. They drop off the conveyor by weight size into different size bins. The chickens are then packed in lined, wooden boxes by size and grade on four separate lines. Each box contains approximately 24 chickens. These boxes are moved by conveyor to the icing station which automatically weighs out a given quantity of ice. The box liners are then folded in and the lid turned over on the box. From there the box goes to an automatic closing machine which closes it and clinches the wires. These boxes are then conveyed to a cooler where they are placed on pallets, approximately 30 boxes to the pallet. Temperature on trucks transporting the processed chicken to market is held at 35 degrees or less.

Twenty-five per cent of the chickens processed at Perdue are cut up into separate pieces and packed in the same manner as whole chickens. Approximately 1% of the Perdue chicken is frozen. It was conceded at argument before us that the department usually regards frozen chicken as within the manufacturing exemption. There was no concession made in the Perdue case for the portion which is frozen, nor is that an issue before us.

At one point Mr. Matthews said:

> "An interesting thing to you fellows may be that when we started processing in 1943 this many birds you couldn't find in a plant. It takes about the same people to completely process

12,000 now as it did to kill and take the feathers off of maybe 3,000 thirty years ago. That's how much it has become mechanized."

The statutes here under consideration exempt from taxation "[r]aw materials on hand and manufactured products in the hands of the manufacturer" and "machinery, manufacturing apparatus or engines used in manufacturing" in those instances where local subdivisions pass appropriate resolutions or ordinances. Machinery in such case is exempt from State taxation regardless of whether a resolution is passed. Wicomico County has acted to provide the exemption.

The history of this exemption was set forth for the Court by Judge (later Chief Judge) Henderson in *Kimball-Tyler v. Balto. City*, 214 Md. 86, 133 A. 2d 433 (1957). The genesis of the present act is found in Chapter 528 of the Acts of 1914 which, as pointed out by Judge Pattison for the Court in *Carroll County v. Shriver Co.*, 146 Md. 412, 126 A. 71 (1924), included in its titling that it was intended "to encourage the development of manufacturing industries in the State of Maryland."

In *Macke Co. v. St. Dep't of Assess. & T.*, 264 Md. 121, 285 A. 2d 593 (1972), Judge Barnes analyzed for the Court prior Maryland cases determining whether or not a particular operation was "manufacturing" within the meaning of the statute. He said this Court had previously considered two factors in reaching a conclusion, (1) "[t]he scale and character of the operation, including the number of employees," and (2) "[t]he common understanding of the word." The department concedes here that Perdue meets the first test. It denies that it meets the second.

In *Perdue v. St. Dep't of Assess. & T.*, 264 Md. 228, 286 A. 2d 165 (1972), we had under consideration the matter of a manufacturer's exemption for yet another phase of the poultry industry, a hatchery.[5] We concluded

---

5. The litigant was Perdue, Inc. The litigant here is Perdue Foods, Inc., a different corporation.

that a hatchery operator was not a manufacturer within the meaning of the statute.

We approach the task at hand bearing in mind the now oft quoted comment of the Court in *Shriver Co.:*

> "It is difficult to say in the abstract what is and what is not a manufacturing industry. What might be a manufacturing industry when defined or construed in connection with a statute exempting tools, machines, engines, etc., from taxation, might not be so held when considered in connection with a statute having a different object or purpose. As said in 26 *Cyc.* 524: 'There is of course a multitude of cases in which particular industries and products have been held respectively to be or not to be manufacture, but it would be useless to cite these cases under the names of the industries or products there the subject of decision; * * * since the fact that a given thing or industry has been held to be manufacture under one set of circumstances is no assurance that it will be so held under another.' " *Id.* at 417.

That case was the first of a number of cases to reach this Court involving a determination as to whether a business operation came within the purview of the manufacturing exemption.

Shriver Co. was a canner "engaged in canning corn, beans, peas and succotash." The operation was described by the Court:

> "The corn, when brought to the factory in the husk, is weighed in the wagon. It is then unloaded by machinery into conveyors and these distribute it to husking machines, by which the husk is removed. The corn is then placed in conveyors and assorted. The damaged and immature ears are taken out and the corn washed. Thereafter it is cut from the cob by machinery

and then placed into conveyors and run through a silking machine, by which all the silk and pieces of cob are removed. It is then run in vats and later put into filling machines where brine, consisting of sugar, water and salt, is added, and its temperature raised to one hundred and eighty or one hundred and ninety degrees. Afterwards it is put into cans which have been cleaned by machinery for sanitary purposes. The cans are then closed and sealed by machinery. It is then placed in retorts, where it is subjected to a heat of two hundred and fifty degrees for seventy or seventy-five minutes and, while so subjected to that heat, it undergoes a chemical change and the bacteria in the corn are killed. The corn is then cooled and thereafter it is carried to the warehouse and stored in wooden cases, where it remains until the time of shipment, when it is labelled." *Id.* at 416-17.

The Court concluded:

"[W]e cannot escape the conclusion, upon the reasoning of *Carlin v. West Assurance Company*, [57 Md. 515 (1882)], that it was foreign to the intention of the Legislature that the industry here involved should not be regarded as a manufacturing industry within the meaning of that law, especially when we consider the condition of the corn, in the husk and on the cob, when received by the appellee, and what was thereafter done by the appellee, at great cost to it and with much benefit to others, through intricate and expensive machinery before placing the corn in cans, which cans thereafter became an essential part of the product, in that by their use only could the corn in its new and changed condition be preserved." *Id.* at 418.

The department cites in support of its position *Arnreich v. State*, 150 Md. 91, 132 A. 430 (1926); *Prentice v. City of Richmond*, 197 Va. 724, 90 S.E.2d 839 (1956); and the opinion of Judge Oppenheimer (prior to his becoming a member of this Court) in *The William Schluderberg-T. J. Kurdle Company v. State Tax Commission*, Docket 65-A, folio 93, No. 34137, in the Circuit Court No. 2 of Baltimore City, decided on December 20, 1956. In the latter case Judge Oppenheimer relied on *Prentice* and *Arnreich*. *Schluderberg*, however, involved a manufacturer's exemption.

In *Arnreich* the Court considered the question of whether a trader's license was required by then Code (1924) Art. 56, § 42 (now Code (1957, 1972 Repl. Vol.) Art. 56, § 32). The three defendants conducted various stalls in Lexington Market in Baltimore City. The statute in question required a license for those who might "barter or sell or otherwise dispose of * * * any goods, chattels, wares or merchandise within this State" with an exception for "the grower, maker or manufacturer." Arnreich sold "fresh sea food, fish, oysters and clams" which he bought at a wholesale market "just as they come from the water." "[I]n order to sell them he had to clean them and occasionally he would split a shad down the back, or sell fresh salmon by the pound, after having bought it whole, cleaned it, and cut it into parts." It was indicated that this "applied to all large fish." He bought oysters, shucked them "and sold them in the same condition, by the pint or quart, as desired." Weil sold veal by the pound. He bought "carcasses of calves as a whole and [cut] them up into pieces." He bought some of the calves alive, which he killed, and others that had been killed. Sloatfield bought lambs alive in Baltimore, Chicago, and Buffalo. He occasionally bought dressed meat. He had the lambs "killed at the abattoir, employing men there to do this." "[H]e then skinn[ed] them and prepare[d] them for market with the help of two men who work[ed] for him." "[H]e carve[d] them into such shape as to make them ready for service on the

table." Judge W. Mitchell Digges there said for the Court:

> "[I]t will be seen that what the appellants did was not the application to material of labor or skill whereby the original article is changed to a different and useful article, but it remained, after the labor and skill had been applied, the same article, not a different one, to be used for the same purpose, not a different one; and further, that the cutting up or dividing of a carcass of lamb or veal into smaller portions, which may be known as steaks or chops, is not the kind of process which is popularly known and regarded as manufacturing. *We, therefore, do not regard the appellants,* or either of them, *as manufacturers in the sense that would relieve them from the necessity of obtaining a trader's license.* The citation of authorities, as stated, as to what does and what does not constitute manufacturing or what does or does not constitute a person a manufacturer, is of little value in determining the instant case, for the reason that all the decided cases have had to do with many different statutes with varying purposes to be accomplished; and, without citing numerous cases which have held *pro* and *con* on this subject, it is sufficient to say that we do not regard the occupation of the appellants, as disclosed by the record, as that of manufacturing."
> *Id.* at 101. (Emphasis added.)

The Court went on, however, to hold Arnreich and his associates were not subject to the license requirements because "of the long, uninterrupted and continuous construction put upon the statute by those charged with the collection of taxes thereunder, and the acquiescence of the Legislature in such construction." Conduct of a butcher shop in Lexington Market is a far cry from the operation carried on by Perdue in this instance. More-

over, the statutes involved are different and have different purposes.

*Prentice* is much closer factually to the current controversy, although on a much smaller scale. The court said of the operation there:

> "There is no conflict in the evidence. Prentice's business operation consists of the buying, killing, cleaning, chilling, and the sale and delivery of poultry to various wholesalers and jobbers. The business is of sufficiently substantial character to encompass an investment of approximately $30,000 in real estate and improvements, and an additional $30,000 in plant machinery. The annual gross sales for processed poultry exceeded $800,000 in 1952, and the cost of live poultry for that year amounted to approximately $670,000." *Id.* at 725.

The work done in *Prentice* included evisceration. The number of chickens processed per hour was 1340 in comparison with the 12,000 here involved. The question presented was whether Prentice was subject to a revenue license tax imposed upon wholesale merchants based upon purchases during the preceding year. The real point at issue was sales. If the sales of Prentice were those of a manufacturer, he was not subject to the tax. Otherwise, he was. Prentice sought to come within an exception which said:

> "All goods, wares and merchandise manufactured by a wholesale merchant and sold or offered for sale as merchandise shall be considered as purchases within the meaning of this section, provided that this section shall not be construed to apply to manufacturers who offer for sale at the place of manufacture goods, wares and merchandise manufactured by them, but such manufacturer may, without a wholesale merchants' license, sell at the place of man-

ufacture the goods, wares and merchandise manufactured by him." *Id.* at 725.

It will be recalled that in *Shriver* Judge Pattison made the point that what might be a manufacturing industry when defined or construed in connection with a statute exempting certain items from taxation might not be so held when considered in connection with a statute having a different object or purpose. That point comes into focus and one sees the essential difference between the point involved in *Prentice* and the case at bar when it is noted that the court said in *Prentice:*

> "A review of the cases from other jurisdictions reveals that there is a diversity of opinion as to whether meat packers are manufacturers within the meaning of tax statutes and ordinances exempting them from taxation. 84 C.J.S., Taxation, § 274, p. 520; 51 Am. Jur., Taxation, § 549, p. 579; 116 A.L.R. 1121; 10 A.L.R. 1299. However, we have been directed to no case in which butchers and slaughterers who *sell* fresh meat only, without curing, grinding, rendering or in some other way altering the essential character of the meat, have been held manufacturers. See *New England Dressed Meat and Wool Co. v. Roberts,* 155 N.Y. 408, 50 N. E. 53; *Commonwealth v. Consolidated Beef Co.,* 242 Pa. 163, 88 A. 975; *Commonwealth v. Consolidated Dressed Beef Co.,* 245 Pa. 605, 91 A. 1065." *Id.* at 729. (Emphasis added.)

The court held Prentice was "not a manufacturer but a wholesale merchant subject to the City tax assessment." It said there was "no change or transformation of the live poultry into an article or product of substantially different character," and that "slaughtering poultry, picking and cleaning it does not constitute such change as is essential to manufacturing."

In *The William Schluderberg-T. J. Kurdle Company*

*v. State Tax Commission, supra,* the same sections of the Maryland statute were involved as we here have under consideration. As Judge Oppenheimer put it, there was no contest of "the claim of the Company that the slaughtering of cattle and hogs and the processing of the carcasses into meat products constitute[d] manufacturing." The only issue was "whether that portion of the Company's business in which the carcasses [were] only carved into size for sale to wholesale butchers [was] exempt from taxation." Judge Oppenheimer, in holding the exemption not applicable, said, "Butchering is butchering, whether carried on by one person or by a hundred." Here when the chickens came out of the plant they were ready for use by the housewife. In *Schluderberg* what came out of the plant were sides of meat which would be later cut up by a butcher; they were not ready for the housewife. The fact that further processing would be required is not a decisive factor, however. In *Baltimore v. Tax Commission,* 161 Md. 234, 155 A. 739 (1931), the Union Shipbuilding Company was engaged in reducing ships to scrap. The scrap was to be used in the manufacture of steel. Judge (later Chief Judge) Sloan said for the Court in holding Union Shipbuilding entitled to the exemption:

> "It is because the shipbuilding company's operations stop here that the city contends the company does not come within the provisions of the statute. If, after cutting the vessels into usable shapes and sizes, it had gone on with the remelting of the steel and its fabrication into finished articles of merchandise ready for use, the city concedes that all the machinery and property employed in the entire process would be entitled to exemption.
>
> "The point made by the city is that the company does not make or manufacture anything; it merely takes a large piece of steel and cuts it into small pieces. This is all true, but it loses

sight of the scale and character of the operation and the means employed. * * * The statute is an invitation to manufacturing industries to go to Baltimore, with the advantage of the exemption from taxation on the one hand and the great public benefit to be derived, on the other, from the addition of the payroll which comes from the employment of a large number of workmen. * * *

"In affirming the judgment of the city court, we simply hold that the Union Shipbuilding Company, as its plant and its operations are described in the record, is what it appears to be, a 'manufacturer' within the meaning of the Acts of 1918, ch. 82, sec. 10." *Id.* at 238-39.

In *H. M. Rowe Co. v. Tax Commission,* 149 Md. 251, 131 A. 509 (1925), the Court made plain that each of these cases must be evaluated upon its own facts, stating:

"A publisher may be a manufacturer or he may not, accordingly as he does or does not manufacture the books, magazines, or other printed matter which he publishes. But the mere fact that he is a publisher does not compel the inference that he is a manufacturer, but the character of the work done in the operation of his publishing business does. So that while the appellant may be properly classified as a publisher, that fact alone is not sufficient to characterize his business as manufacturing, for that must be determined not by the name given the business but by the character of the work done in the course of its operation." *Id.* at 260.

This comment was later quoted in *American Newspapers v. Tax Commn.,* 174 Md. 56, 59, 197 A. 574 (1938), yet another case involving construction of this statute.

In *Bornstein Sea Foods v. State,* 60 Wash. 2d 169, 373

P. 2d 483 (1962), a case involving the question of whether "filleting, packaging, and freezing of fish" were included within the term "to manufacture" under a Washington statute placing a tax on manufacturers, Chief Judge Finley said:

"It is true, as appellant contends, that after the filleting process is accomplished the end product is fish in fillet form. In the *Stokely-Van Camp* case [*Stokely-Van Camp v. State*, 50 Wash. 2d 492, 312 P. 2d 816 (1957)], however, the taxpayer performed a process on peas (and other vegetables and fruits), and, after the process, he still had peas. In *Drury The Tailor v. Jenner*, [12 Wash. 2d 508, 122 P. 2d 493 (1942)], a tailor transformed a bolt of cloth into a suit; the end product was still cloth, in the form of a suit. In *J. & J. Dunbar & Co. v. State*, [40 Wash. 2d 763, 245 P. 2d 1164 (1952)], the taxpayer removed impurities from whiskey. The end product was whiskey. The crucial point in each of these cases was the fact that the activities of the taxpayer changed a product to make it more usable. The process of filleting transforms near valueless whole bottom fish into useful and salable consumer items. This change is significant. The fact that the end product is still fish does not mean that the end product is not new and different after the process of filleting is accomplished." *Id.* at 176-77.

We must bear in mind the principle stated by Judge (later Chief Judge) Prescott for the Court in *Md. State Fair v. Supervisor*, 225 Md. 574, 172 A. 2d 132 (1961):

"This Court has said many times (and Section 9 so provides with reference to exemptions thereunder) that tax-exemption statutes are to be strictly construed, but a strict construction permits a fair one, so as to effectuate the legis-

lative intent and objectives, and it does not require that an unusual or unreasonable meaning be given to the words used in an exemption statute. *State Tax Comm. v. Standard Oil Co.,* 181 Md. 637, 640, 31 A. 2d 621; *State Tax Comm. v. Whitehall,* 214 Md. 316, 320, 135 A. 2d 298." *Id.* at 588.

"The rule of strict construction of tax exemptions does not call for strained or unreasonable construction to the extent of being adverse to the real legislative intention, for the judicial interpretation must always be in accordance with the actual meaning of the lawmaking power." *Pittman v. Housing Authority,* 180 Md. 457, 460-61, 25 A. 2d 466 (1942).

In *Carlin v. West Assurance Co.,* 57 Md. 515 (1882), our predecessors, in holding a flour mill to be a manufacturing establishment, said:

"The counsel for appellant contended that making flour from wheat, reasoning from the etymology of the word, and the nature of the process, is not manufacturing. But whilst, from its derivation, the primary meaning of the word 'manufacture' is making with the hand, this definition is too narrow for its present use. Its meaning has expanded as workmanship and art have advanced; so that now nearly all artificial products of human industry, nearly all such materials as have acquired changed conditions or new and specific combinations, whether from the direct action of the human hand, from chemical processes devised and directed by human skill, or by the employment of machinery, which after all is but a higher form of the simple implements with which the human hand fashioned its creations in ruder ages, are now commonly designated as 'manufactured.'" *Id.* at 525-26.

Nearly half a century has passed since the decision of our predecessors in *Shriver*. Although the General Assembly has amended the tax exemption statute relative to manufacturers a number of times since then, its exemption provisions remain virtually unchanged. There has been no attempt by the General Assembly to define the terms "manufacturer," "used in manufacturing," or "manufacturing" except for the definition of "manufacturing" in § 2 (25) making it plain that sawmills, grain or feed mills, and "machinery and equipment used in the extraction and processing of minerals, metals, or any earthen material, and/or by-products resulting from such extraction or processing" are to be included within the term. This definition, by analogy, could be carried over to the operation here. From this failure to define, the inference is drawn that the Court's determination of legislative intent in *Shriver* meets with the approval of the General Assembly. *Macke Co., supra,* at 132-33.

This case comes squarely within *Shriver*. There corn and other vegetables in a form not yet ready for consumption were received at the cannery or processing plant. Here live chickens were received. There the corn was prepared by husking, removing silk, and cutting from the cob. Here the chickens were killed and feathers, feet, head, and entrails were removed. Washing was done in both instances. Mechanized equipment was used in both instances. There the temperature of the corn was raised, first to 180 degrees and then to 250 degrees, not for the purpose of cooking, but to kill bacteria and thus permit holding for ultimate consumption by the American buying public. Here the temperature was lowered to 35 degrees to permit holding until purchased by the ultimate consumer. There the corn was placed in cans. Here the chicken was placed in boxes. Automatic closing machines were used in both instances. In both instances, to borrow words from *Bornstein,* the taxpayer changed a product to make it more valuable; what by virtue of sheer volume would have been "near valueless" items were transformed "into useful and salable con-

sumer items." The Court mentioned the condition of the corn when received, "in the husk and on the cob," and described what was done in *Shriver* as with "great cost to it and with much benefit to others, through intricate and expensive machinery before placing the corn in cans." One could here state that the chickens were received live and then go on to make precisely the same comments as to their processing before being placed in boxes.

One can examine the Court's comments in *Carlin*, think back to the day of home canning of vegetables, read *Shriver*, and then see from the testimony of Mr. Matthews a similar type of evolution in the poultry industry.

We have previously alluded to Judge Pattison's comment in *Shriver* that what is deemed manufacturing for the purpose of one statute may not be so regarded under another statute having a different purpose. Practical applications of that comment have been shown. We also have mentioned the announced purpose of the tax exemption statute as set forth in the title of Ch. 528 of the Acts of 1914. Considering those points together with *Shriver* and subsequent cases on the subject, the conclusion is inescapable that Perdue's operation is manufacturing within the legislative purpose and intent as embodied in the statute. Accordingly, the exemption should be allowed.

> *Order reversed and case remanded for passage of an order in accordance with this opinion; appellee to pay the costs.*