667 A.2d 910

**COMPTROLLER OF the TREASURY**

v.

**DISCLOSURE, INC.**

No. 46, Sept. Term, 1995.

Court of Appeals of Maryland.

Dec. 4, 1995.

**676**

Deborah B. Bacharach, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Sheldon H. Laskin and Gaylin Soponis, Assistant Attorneys General, on brief) Baltimore, for Appellant.

Paula M. Junghans (Martin, Junghans, Snyder & Bernstein, P.A., on brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case involves the scope of Maryland's exemption from sales and use taxes for equipment used in manufacturing. We must determine whether activities which would be considered

"manufacturing" when the entire manufacturing process is performed by one company are to be denied the status of "manufacturing" when the final stage of the manufacturing process is performed under contract by an outside supplier. We hold that work performed by the outside supplier cannot be considered when determining whether the principal company's activities are substantial enough to be described as "manufacturing." We also hold, however, that when the principal company performs a substantial step in the process of manufacturing a product that it sells, the equipment used in that substantial step is entitled to the manufacturing exemption regardless of who performs the final stage of the manufacturing process.

## I

### A

Disclosure, Inc. (Disclosure) is a company located in Maryland that sells compilations of financial information. In creating these compilations, it obtains financial information from a variety of public sources. Disclosure then collates and organizes this information into a specific format. The compiled information is then copied onto various media in which it is sold to Disclosure's customers. Disclosure makes the compiled information available on paper, in main-frame computer resident databases, and on CD–ROMs.[1]

In producing a compilation of financial information on CD–ROM, Disclosure follows several steps. First, all of the financial documents that are to be included on the CD–ROM are optically "scanned." In this process, an electronic copy of each of the paper documents is created and stored in a computer. Disclosure then checks each electronic document to ensure that it is an accurate copy of the original paper document. If an electronic document is not an accurate copy,

---

1. "CD–ROM" means "Compact Disc—Read Only Memory." Thus, a CD–ROM is a compact disc containing information that can be read by a computer.

Disclosure will optically scan the original paper document a second time. During this second step, Disclosure adds a "table of contents" to the electronic copy of the original document. The table of contents enables the eventual user to find particular items of interest.

In the third step, referred to as "stapling," the pages of the electronic documents are rearranged to ensure that the various pages of each document are stored in the proper order and as a single document. Disclosure then "formats" all of the electronic documents by translating them into the format in which they will be copied onto compact discs. At the end of this process, the financial information is encoded onto an electronic tape in the format in which it will ultimately appear on the completed discs.

Disclosure then sends the encoded magnetic tape to 3M, a company located in Wisconsin. 3M copies the information stored on the magnetic tape onto CD–ROMs. Disclosure pays 3M a "mastering" charge to produce the original "master" from which multiple CD–ROMs can be replicated. Disclosure also pays a separate charge for each CD–ROM that is replicated from the master. 3M disposes of these CD–ROMs according to directions from Disclosure. Some of the CD–ROMs are shipped by 3M directly to Disclosure's customers. Others are shipped to Disclosure, where they are held as inventory.

This case follows from an attempt by the Sales and Use Tax Division of the Comptroller of the Treasury (Comptroller) to levy an assessment of $14,654.40 against Disclosure for allegedly failing to pay taxes on the purchase of computer equipment used by Disclosure to prepare financial information for use in its CD–ROM products. Disclosure appealed the assessment to the Maryland Tax Court, asserting that its purchase of the equipment was exempt from taxation because the equipment was used to manufacture a product. With the exception of some equipment used to test the completed CD–ROM product, the tax court found that Disclosure's equipment fell within Maryland's sales and use tax exemption for "manufacturing machinery and equipment."

The Comptroller appealed to the Circuit Court for Montgomery County, which affirmed the tax court's order. The Comptroller then noted an appeal to the Court of Special Appeals. We granted certiorari on our own motion to consider whether the equipment purchased by Disclosure qualified as manufacturing machinery or equipment and was therefore not exempt from sales and use taxes.

### B

The assessment levied against Disclosure covered the period of December 1, 1986 through November 20, 1990. Because the relevant statute was recodified in 1988, two different statutes apply during this interval. Prior to 1988, Md.Code (1957, 1980 Repl.Vol., 1988 Supp.) Art. 81, § 326(mm) exempted sales of "manufacturing machinery and equipment" from sales and use taxes. Section 324(a)(1) of that article defined "manufacturing machinery and equipment" as

> all machinery and equipment which by acceptable and consistent accounting standards is capitalized for the purpose of claiming depreciation and which is used in manufacturing, assembling, processing or refining products for sale at any stage of the operations, from the handling of raw materials or components on the manufacturing site until the product is ready for delivery or storage....

In 1988, the manufacturing equipment exemption was recodified as Maryland Code § 11–210(b) of the Tax–General Article (1988). That section, in pertinent part, provides that Maryland's sales and use tax does not apply to a sale of

> machinery or equipment ... that:
>
> (i) is capitalized to claim depreciation ...;
>
> (ii) is not used in administration, management, sales, or any other nonoperational activity;
>
> (iii) at any stage of operation from the handling of raw material or components on the production activity site to the time the product is ready for delivery or storage, is used:
>
> 1. in a production activity; or

    2.  for research and development....; and

(iv) ... is not installed so that it becomes real property....

§ 11–210(b)(1). Section 11–101(d)(1), in relevant part, defines "production activity" as "assembling, manufacturing, processing, or refining tangible personal property for resale." Section 11–101(d)(2) specifically excludes servicing, repairing, or maintaining tangible personal property, and testing finished products from the definition of "production activity."

The issue of statutory construction before us is a narrow one. The Comptroller has not asserted that the computers at issue do not qualify as "machinery and equipment" and there is no dispute over the capitalization or depreciation of the equipment. *See* § 11–210(b)(1)(i). The Comptroller has not asserted that the equipment was used in administration "or other nonoperational activity," *see* § 11–210(b)(1)(ii); or that the equipment was used to service, maintain, or repair tangible property, *see* § 11–101(d)(2); or that it was used for research and development, *see* § 11–210(b)(1)(iii)(2); or that it was incorporated into real property. *See* § 11–210(b)(1)(iv).

Under either the pre- or post–1988 versions of the exemption, therefore, Disclosure's equipment is exempt if "at any stage of operation from the handling of raw material or components on the production activity site to the time the product is ready for delivery or storage," § 11–210(b)(1)(iii), it is used to "assembl[e], manufactur[e], process[ ], or refin[e] tangible personal property for resale." § 11–101(d)(1); *see* Art. 81, § 324(a)(1) (providing that the equipment is exempt if it "is used in manufacturing, assembling, processing or refining products for sale at any stage of the operations, from the handling of raw materials or components on the manufacturing site until the product is ready for delivery or storage").

II

A

As an initial matter, we must determine the standard of review to be applied. In *State Department v. Consumer Programs*, 331 Md. 68, 72, 626 A.2d 360 (1993), we noted that

[i]n an action for judicial review, the Tax Court's factual conclusions will be upheld if supported by substantial evidence in light of the record as a whole.... A reviewing court will reverse a decision of the Tax Court, however, if the agency erroneously determines or erroneously applies the law...."

(citations omitted). The Comptroller does not dispute the facts as found by the tax court. Instead, the Comptroller argues that it misapplied the statutory exemption for manufacturing equipment. To the extent that the tax court's decision involves an interpretation of law, we shall fully review that interpretation. *See Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834, 490 A.2d 1296 (1985). To the extent that the tax court's application of the statute relies on underlying factual determinations, however, its order will not be reversed if substantial evidence supports it.

In reviewing the tax court's construction of the exemptions provided in § 11–210 of the Tax Article and Art. 81, § 326(mm), we are mindful that tax-exemption statutes are to be strictly construed. *Perdue v. St. Dep't of Assess. & T.,* 264 Md. 228, 233, 286 A.2d 165 (1972). It is also true, however, that

[t]he rule of strict construction of tax exemptions does not call for strained or unreasonable construction to the extent of being adverse to the real legislative intention, for the judicial interpretation must always be in accordance with the actual meaning of the lawmaking power.

*Pittman v. Housing Authority,* 180 Md. 457, 460–61, 25 A.2d 466 (1942), *quoted in Perdue Foods v. St. Dep't of A. & T.,* 264 Md. 672, 688, 288 A.2d 170 (1972). In construing a tax exemption for manufacturing activities, "this Court has been guided by the legislative purpose and history of the exemption, which is to encourage the location, development and growth of industry in Maryland." *Consumer Programs, supra,* 331 Md. at 72, 626 A.2d 360.

B

■ In ascertaining whether an activity can be described as "manufacturing," we determine "whether a product has gone through a substantial transformation in form and uses from its original state." *Perdue, supra,* 264 Md. at 237, 286 A.2d 165, *quoted in Consumer Programs, supra,* 331 Md. at 73, 626 A.2d 360. Both parties agree that the placement of publicly available financial information onto a computer-readable compact disc causes a transformation sufficient to constitute manufacturing. The Comptroller and Disclosure, however, adopt different views as to the relationship between Disclosure's activities in Maryland and the process of manufacturing the CD–ROMs.

■ The Comptroller asserts that Disclosure's activities in preparing the magnetic tape that Disclosure sends to 3M should be separated from 3M's activities in manufacturing the CD–ROMs. The Comptroller posits that Disclosure's activities in Maryland only produce a magnetic tape that Disclosure does not sell to anyone. Under this view, the equipment used by Disclosure does not fall within the statutory exemption because it is not used to produce "tangible personal property for resale." § 11–210(b)(1)(iii); *see also* Art. 81, § 324(a)(1) (requiring that the equipment be used to create "products for sale"). The Comptroller claims that Disclosure only assembles the "data input media" that is used by 3M to manufacture the compact discs, and that if Disclosure's activities are "manufacturing," every recording studio in Maryland must also be considered to be a manufacturer.

Disclosure argues that its activities in Maryland should be seen as a part of an entire manufacturing process that begins with the scanning of the financial documents and ends with the production of the completed compact discs. Under this view, Disclosure begins the manufacturing process by preparing the informational content of the CD–ROMs. Disclosure asserts that 3M's placement of the information onto compact discs is simply the final stage in this process. Disclosure also argues that its decision to contract one stage of this process to an

outside supplier should not alter how the tax exemption is applied to other parts of the process.

Disclosure is correct in its assertion that the CD–ROMs are the relevant "product for sale," rather than the magnetic tape that is used as an intermediary medium of storage. In *Consumer Programs, supra,* 331 Md. at 72, 626 A.2d 360, we noted that "[i]n defining the words 'manufacture' or 'manufacturing,' the Court has ... been guided by the normal, non-technical meaning of the words." This principle of construction should also be applied to the determination of what "product" is being created by a particular manufacturing process.

In any manufacturing process, there is no "product for sale" until after the final stage. Thus, every stage in a manufacturing process except for the final one produces something that is intermediary and not "for sale." The only way to determine whether or not a particular piece of equipment is used to create a product for sale is to look at the product that is actually sold, and to trace backwards along the production process to determine if the equipment was used in that process.

In determining what "product for sale" is at issue, it is irrelevant whether some of the stages in the manufacturing process were performed by outside contractors. If we adopted the Comptroller's reasoning, a manufacturer who contracts out the last stage of a production process would be denied the exemption, because it only produces some intermediary material that is not "sold" but is incorporated into a later product. By contrast, a manufacturer who contracts out the first stages of a production process *would* be able to claim the exemption because it performs that crucial last step whereby a "product for sale" springs into being.

We find nothing in the statute to support treating manufacturers who employ others to perform the initial stages of a manufacturing process differently from manufacturers who contract out the final stages. In this case, Disclosure sells CD–ROMs containing financial information, and does not sell

the magnetic tape. Thus, the compact discs are the relevant "product for sale."

The Comptroller has confused the determination of what "product" is being created from the question of whether Disclosure's activities in Maryland are significant enough to be considered "manufacturing." In *H.M. Rowe Co. v. Tax Commission*, 149 Md. 251, 261, 131 A. 509 (1925), we declined to extend a manufacturing exemption "by giving to the language of the statute creating it a construction so forced, strained and unnatural as would be necessary to permit us to hold that one who procures the products which he markets to be manufactured by another, not his agent, manufactures them himself." In that case, we determined that the appellant's contributions to the manufacture of the final product were so minimal that they could not be considered "manufacturing" for the purpose of the exemption. We assumed, however, that the books and forms at issue in that case were the relevant products under consideration, regardless of who performed the final stage of their manufacture.

Following cases such as *H.M. Rowe Co.*, the Comptroller is correct in asserting that 3M's actions cannot be attributed to Disclosure for the purposes of determining whether Disclosure's activities can be fairly termed "manufacturing." This question, however, focuses on the substantiality of Disclosure's activities rather than on the definition of the final product. Before Disclosure can be fairly described as "manufacturing" the CD–ROMs, we must ask "whether a product has gone through a substantial transformation in form and uses from its original state." *Perdue, supra,* 264 Md. at 237, 286 A.2d 165. Thus, Disclosure can only claim the manufacturing tax exemption for equipment used in its activities in Maryland if those activities cause a "substantial transformation" in the materials used to create Disclosure's CD–ROMs.[2]

---

2.  Contrary to the Comptroller's assertion, our holding that Disclosure is engaged in a manufacturing activity does not entitle every recording

Disclosure's operation in Maryland converts paper documents into electronic documents, and then converts the electronic documents into a format used for computer readable compact discs. The tax court clearly had sufficient evidence to support its finding that Disclosure's activities constituted a substantial transformation. For this reason, the circuit court correctly affirmed the tax court's decision that Disclosure was entitled to the manufacturing exemption for equipment used by it to create the information ultimately incorporated into the CD–ROMs.

## C

The Comptroller also asserts that Disclosure's plant in Maryland is not a "manufacturing site" or "production activity site." The success of this argument depends heavily upon whether the activities at Disclosure's site are characterized as "manufacturing" or "production activity." The equipment for which Disclosure claims the manufacturing equipment exemption is located at a single site. To the extent that Disclosure's activities in Potomac, Maryland can be described as "manufacturing," its site can be described as a "manufacturing site."

The statutory references to a "manufacturing site" or "production activity site" do not mean that each product must have a single, unitary site of manufacture. Similarly, we find nothing in the statute to indicate that when multiple sites are used to produce a product in stages, the only "manufacturing" site is the one performing the final stage of the operation. Such a conclusion ignores economic reality and the increasing

---

studio to an exemption from sales taxes as a "manufacturer." As we noted in *H.M. Rowe, supra*, 149 Md. at 259, 131 A. 509, labor that is "clerical, intellectual, or literary" cannot be considered manufacturing. Composition of a book cannot be considered "manufacturing," while preparing completed manuscripts for printing may be. *See id.* at 260–61, 131 A. 509. The same distinction is true for the preparation of music or other information for storage on a compact disc. The Comptroller and tax court face the problem of separating product development from product manufacturing in every industry.

geographical dispersion of modern production processes. The requirement that equipment be located on a manufacturing site in order to claim the manufacturing exemption prevents companies from claiming exemptions for equipment used for product transportation, at the point of sale, or in other isolated off-site activities that fall outside of the common understanding of "manufacturing." Where the equipment for which the manufacturing exemption is claimed is located at the site where a substantial step towards the product's manufacture takes place, we cannot conclude that the tax court erred in granting the exemption.

*JUDGMENT AFFIRMED WITH COSTS.*