[No. 36522.   Department One.   August 29, 1963.]

CONTINENTAL COFFEE COMPANY OF WASHINGTON, *Respondent*,
v. THE STATE OF WASHINGTON, *Appellant*.*

*The Attorney General, James A. Furber* and *Henry W. Wager, Assistants*, for appellant.

*Ryan, Askren, Carlson, Bush & Swanson* and *Laurance S. Carlson*, for respondent.

HUNTER, J.—This is an action for a refund of business and occupation taxes levied by the defendant (appellant), the Tax Commission of the State of Washington, and paid under protest by the plaintiff (respondent), Continental Coffee Company of Washington.

The plaintiff is in the business generally of selling coffee, tea, spices and condiments of all kinds and description to restaurants, hospitals and other large users of such products. It secures green coffee beans from various countries throughout the world in large, 132 to 200-pound burlap

*Reported in 384 P. (2d) 862.

bags. At its 6-story building in Seattle, the following processing operation is carried on by the plaintiff:

(1) The bags of green coffee from various countries—which are mixed to form a blend—are dumped into a green coffee dump bin. (2) From there, the coffee blend goes to a green coffee cleaner, a machine which uses air to separate lint, dust, and other materials lighter than the beans themselves. (3) The beans then go by bucket elevator to an upper floor and a green coffee mixer or blender. There, they are thoroughly mixed in a cylinder which revolves at high speeds until every pound sample is absolutely like another. (4) When this process is completed, the beans are dropped into a mixed green coffee storage bin, ready for roasting. (5) There are three roasters, each of which can receive approximately 500 pounds of these stored beans. In the roaster, the bean blend is subjected to temperatures ranging from four or five hundred to nine hundred degrees for a period of approximately 15 minutes. During this time, the coffee is revolved to insure uniform roasting. The roasting changes the beans' color and extracts 13 per cent of the beans' moisture. (6) At a moment determined by automatic instruments, the heat is cut and the coffee beans are dropped from the oven into stirplex coolers. They are there cooled by means of a down draft of air that is drawn through the coffee beans to check further "development." (7) In about 2 minutes, the coffee is discharged into a hopper and then to a stoner. The stoner sucks the coffee upwards, leaving behind all extraneous matter heavier than the roasted beans. (8) The beans which are sucked upwards by the air are deposited into the roasted coffee bin. At this point, some of the whole beans are drawn off and bagged for shipment. (9) The remaining coffee is sent to the grinder where, depending on what has been ordered, two kinds of grinds are produced. (10) This coffee is finally weighed and canned or sacked, ready for shipment.

To the extent the plaintiff sold coffee out of the state which was produced by the above activity, the defendant levied a business and occupation tax. The plaintiff paid

the tax under protest and petitioned for a refund. From the denial of its petition for refund, the plaintiff appealed to the Superior Court of Thurston County. Following a hearing, the trial court entered a judgment for the plaintiff granting a refund with allowable interest and costs and disbursements. The defendant then commenced this appeal.

The sole question on this appeal is whether the plaintiff's business activities of processing green coffee beans into coffee ready for shipment and sale out of state constitute manufacturing under the applicable taxing statutes.

RCW 82.04.110 defines a "manufacturer" as follows:

" 'Manufacturer' means every person who, either directly or by contracting with others for the necessary labor or mechanical services, manufactures for sale or for commercial or industrial use from his own materials or ingredients any articles, substances or commodities. When the owner of equipment or facilities furnishes, or sells to the customer prior to manufacture, all or a portion of the materials that become a part or whole of the manufactured article, the tax commission shall prescribe equitable rules for determining tax liability."

RCW 82.04.120 defines the term "to manufacture" as follows:

" 'To manufacture' embraces all activities of a commercial or industrial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful substance or article of tangible personal property is produced for sale or commercial or industrial use, and shall include the production or fabrication of special made or custom made articles."

■ As observed from reading RCW 82.04.120, whether manufacturing has occurred depends on whether a "new, different or useful" substance or article has been produced. The defendant contends the three cases of *Bornstein Sea Foods, Inc. v. State*, 60 Wn. (2d) 169, 373 P. (2d) 483 (1962), *Stokely-Van Camp v. State*, 50 Wn. (2d) 492, 312 P. (2d) 816 (1957), and *J & J Dunbar & Co. v. State*, 40 Wn. (2d) 763, 245 P. (2d) 1164 (1952), are dispositive of the issue presented in the instant case. With this contention, we agree.

In the *Bornstein* case, where we held that the processing of near valueless whole bottom fish into fish fillets which were useful and salable consumer items constituted manufacturing, we said

". . . whether a new, different, and useful article has been produced is whether a significant change has been accomplished when the end product is compared with the article before it was subjected to the process. . . ."

Applying this test, we find that the changing of green coffee beans, useful only to coffee processors, to a roasted and blended coffee, a usable consumer item, is a change of such significance as to render it manufacturing under the *Bornstein* decision.

In the *Stokely-Van Camp* case, we held that the processing and freezing of fresh fruits and vegetables constituted manufacturing, despite the taxpayer's contention that its activities did not create a degree of usefulness which had not previously existed, but merely preserved that same degree. The reasoning under the facts of the *Stokely-Van Camp* case is applicable to the instant case. Since, in the *Stokely-Van Camp* case, the process of preserving an already edible food constituted manufacturing, it follows that a process which takes an inedible product and, by blending and roasting, creates an edible product must also be manufacturing.

In the *J & J Dunbar* case, the process of converting raw whiskey, which was not suitable for consumption as a beverage, into one capable of use as such was found to constitute manufacturing. That case involved the screening out of charcoal particles and other foreign matter from nonpotable whiskey. With the addition of water, an 85 proof whiskey was produced, which was then bottled and sold. The activities in both the *J & J Dunbar* case and the instant case have achieved the same result—the conversion of a product not suitable for consumption to one that is. If the mere activity of screening and filtering of raw whiskey constitutes manufacturing, then the blending and roasting of green coffee must also constitute manufacturing.

■ The plaintiff, however, contends that its activities do not exceed in scope or in results the process involved in the pasteurization of milk, a process which the Tax Commission, by its Rule 136, has decided does not constitute manufacturing. Whether the plaintiff's activities constitute manufacturing must be determined by construing RCW 82.04.120 in relation thereto, with the help of applicable case authority, and is not controlled by Rule 136, relative to the pasteurization process. We need not discuss the effect of Rule 136 and do not do so as its consideration is not before us on this appeal.

The judgment of the trial court is reversed.

HILL, FINLEY, ROSELLINI, and HALE, JJ., concur.

October 15, 1963. Petition for rehearing denied.