THE CHARLES RIVER BREEDING LABORATORIES, INC. *vs.*
STATE TAX COMMISSION
(and a companion case[1]).

Suffolk. November 9, 1977. — February 6, 1978.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Taxation,* Manufacturing corporation. *Words,* "Manufacturing."

A corporation engaged in breeding and raising for biomedical research animals free from common germs and diseases was not a "manufacturing" corporation under G. L. c. 58, § 2, although its intricate processes required specially designed buildings and equipment. [335-336]

APPEAL from a decision of the Appellate Tax Board.

*R. Robert Popeo (Edward L. Selgrade, David H. Halpert & Jerome S. Hertz* with him) for the plaintiffs.

*Maureen Dewan,* Assistant Attorney General (*Mitchell J. Sikora, Jr.,* Assistant Attorney General, with her) for the State Tax Commission.

WILKINS, J. In 1974 and 1975, the appellants were engaged in the large scale production of laboratory animals at a site in Wilmington. Each appellant argues that it should have been classified as a manufacturing corporation in those years and, as a result, its machinery should have been ex-

---

[1] The companion case is The Charles River Mouse Farms, Inc. *vs.* State Tax Commission. This appellant was a subsidiary of The Charles River Breeding Laboratories, Inc., until October 31, 1975, when it was merged with its parent. The Appellate Tax Board considered the taxpayers' appeals in a consolidated proceeding, and the cases have been consolidated for the purposes of this appeal.

empted from local taxation. See G. L. c. 59, § 5, Sixteenth (3). The Appellate Tax Board (board) considered the appellants' appeals from the commission's failure so to classify them under G. L. c. 58, § 2, and ruled, both as matter of law and of fact, that the term "manufacturing" did not apply to the breeding and raising of animals, "irrespective of the manner in which they may be 'originated', or raised." We affirm the board's decision.

The appellants, who will be referred to collectively as Charles River, breed and raise for biomedical research animals that are free from common germs and diseases. Charles River's procedures are intricate and require great care, skill, and attention.[2] Its buildings and equipment are specially designed to create a protected environment where temperature, humidity, and ventilation are controlled.[3] Charles River sends its animals, germ-free, in special packaging material, to customers in the pharmaceutical industry and to educational and governmental institutions anywhere in the world. In 1976, Charles River, which employs over 300 people at its Wilmington plant, sold 6,000,000 animals, ordered by weight, sex, age, or a particular strain.

---

[2] "Babies of pregnant mice are delivered at term by Cesarean surgery into a sterile system free of bacteria. These baby mice are then fed by germ-free foster mothers. While still young, they are reassociated with selected bacteria, for if they were totally germ-free, they would succumb to relatively harmless types of organisms. The mice breed and their offspring are delivered naturally. They are subsequently removed from their isolation units and prepared, together with their progeny, for life in a rigidly controlled but nonsterile atmosphere sustained behind physical barriers between them and the outside world (Barrier Sustained). They are then sold under the acronym COBS (Cesarean Originated-Barrier Sustained)."

[3] "The animals receive sterile bedding and pasteurized diet. Their bedding and food are introduced into the approximately 40 separate breeding rooms by a sealed pneumatic conveyance system. Each of the separate breeding rooms is autonomous in operation. The personnel don't enter other breeding rooms in order to maintain complete isolation of each colony of rats and mice. Each breeding room has its own separate air filtration system and temperature monitoring alarm systems. The breeding rooms are equipped with emergency diesel generators."

The question here is whether the processes carried on by Charles River are manufacturing as matter of law. Charles River argues that the statutory exemption from local taxation, first set forth in St. 1936, c. 362, § 1, should be construed "to benefit those aspects of the present-day Massachusetts industry which are economically similar to the mills and factories of the 1930's." It relies also on our opinions which have said that the words "engaged in manufacturing" are "words of flexible meaning" (*Commissioner of Corps. & Taxation* v. *Assessors of Boston,* 324 Mass. 32, 36 [1949]) and "are not to be given a narrow or restricted meaning." (*Assessors of Boston* v. *Commissioner of Corps. & Taxation,* 323 Mass. 730, 748-749 [1949]). See *Joseph T. Rossi Corp.* v. *State Tax Comm'n,* 369 Mass. 178, 180-181 (1975). Charles River argues that it engages in manufacturing because its processes require a heavy investment, skilled personnel, mass production, and reliance on machinery.

In our cases dealing with taxpayers seeking favored status as "manufacturing corporations," we have said that the word "manufacturing" in the controlling statutes must be considered according to the natural and ordinary meaning of the word. *Franki Foundation Co.* v. *State Tax Comm'n,* 361 Mass. 614, 617 (1972). We think it plain beyond question that, in common understanding, the breeding of animals is not manufacturing. Manufacturing normally involves a change of some substance, element, or material into something new or different. *Id.* at 619, and cases cited. No matter how intricately it is carried on, the production of partially uncontaminated animals by Charles River does not fit within this definition. The board was not compelled to find, as matter of law, that the procedures by which partially uncontaminated animals were produced constituted manufacturing.[4]

---

[4] We leave to another day, if it comes, the question whether processes which alter the genetic structure of animals fall within the statutory concept of manufacturing.

In other jurisdictions, under admittedly different tax statutes, courts have rejected the argument that raising animals is "manufacturing." See

We have also been guided in determining the scope of the word "manufacturing" by a consideration of the legislative purpose behind the creation of this special tax treatment. *First Data Corp.* v. *State Tax Comm'n*, 371 Mass. 444, 447-448 (1976), and cases cited. The statutory purpose of attracting new manufacturing corporations and aiding "mills and factories" which were falling into decline in 1936 (see *Franki Foundation Co.* v. *State Tax Comm'n, supra* at 618; *Fernandes Super Mkts., Inc.* v. *State Tax Comm'n*, 371 Mass. 318, 321-322 [1976]) does not strengthen Charles River's claim. The statutory goal was not to encourage and preserve all industry in the Commonwealth but only that portion of industry represented by manufacturing corporations. Whether such a legislative distinction was and remains wise is beyond our province. See *First Data Corp.* v. *State Tax Comm'n, supra* at 448.

The decision of the Appellate Tax Board is affirmed.

*So ordered.*

---

*Holloway* v. *State*, 262 Ala. 437, 440 (1955), and cases cited. As human involvement in the processes of nature becomes more intense, an animal raiser's claim for status as a manufacturer has sometimes been successful. The use of incubators did not make manufacturers out of the owners of commercial chicken hatcheries in *Perdue, Inc.* v. *State Dept. of Assessments & Taxation*, 264 Md. 228 (1972), or in *Peterson Produce Co.* v. *Cheney*, 237 Ark. 600, 602-603 (1964), but did in *Master Hatcheries, Inc.* v. *Coble*, 286 N.C. 518, 522 (1975) (4-3 decision), and in *Miller* v. *Peck*, 158 Ohio St. 17, 20-21 (1952). The views of one dissenting Justice of the North Carolina Supreme Court seem to us apt: "Every layman of normal intelligence knows that a hatchery does not 'manufacture' baby chicks, and the law does not require judges to be more ignorant than other people." *Master Hatcheries, Inc.* v. *Coble, supra* at 524 (Huskins, J., dissenting).