WESTINGHOUSE BROADCASTING COMPANY, INC. *vs.*
COMMISSIONER OF REVENUE.

Suffolk. December 1, 1980. — January 23, 1981.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Taxation,* Manufacturing corporation, Broadcasting company, Television, Radio. *Constitutional Law,* Equal protection of laws. *Words,* "Manufacturing."

The Appellate Tax Board did not err in concluding, on the basis of the record before it, that a corporation engaged in television and radio broadcasting was not a manufacturing corporation within the meaning of G. L. c. 63, § 42B. [357-359]

There was no support in the record of a proceeding before the Appellate Tax Board for the contention of a corporation engaged in television and radio broadcasting that the board's refusal to classify it as a manufacturing corporation denied it equal protection of the laws because the board had classified as manufacturers two corporations which published newspapers. [359-360]

APPEAL from a decision of the Appellate Tax Board.

*Joseph L. Kociubes* for the plaintiff.

*Stephen S. Ostrach,* Assistant Attorney General, for the defendant.

KAPLAN, J. In August, 1976, Westinghouse Broadcasting Company, Inc., an Indiana corporation which owns and operates a television and radio station in Boston (WBZ-TV; WBZ, AM and FM) found itself on the Commissioner of Revenue's list of the corporations liable to taxation as of January 1, 1976, but not classified thereon as a manufacturing corporation. The company applied to the State Tax Commission under G. L. c. 58, § 2, for manufacturing classification, so that it would then qualify under the provisions of G. L. c. 63, § 42B, and G. L. c. 59, § 5, Sixteenth, for exemption of its machinery, of an estimated value of $1.3 mil-

lion, from local taxation.[1] No relief was forthcoming from the Commission, and an appeal to the Appellate Tax Board (G. L. c. 58, § 2) also failed.[2] The company appeals the Board's decision to this court pursuant to G. L. c. 58A, § 13.

1. The record made before the Board consisted of a "joint stipulation of facts" (dated in October, 1979) and brief additional evidence. Emerging from the record was a picture of operations that is apparently familiar in television and radio broadcast.

We sketch the television side, which accounted for 80% of the company's combined television and radio income. Some 33% of air time consisted of programs produced by the company — a miscellany of news, sports, and other material largely of a local character. The balance of time was given over to material supplied by the network and others. Ninety-four per cent of TV income was derived from the sale of advertising displayed during the broadcasts;[3] less than 5% was compensation for carrying network programs.

With respect to the technique of accomplishing the broadcast of the visual element of the programs, the stipulation found it convenient to mention five chief sources or components. (i) Live programs. TV cameras receive light waves reflected from the studio subjects; these are transformed by the cameras into electrical impulses. (ii) Films or slides. Light is projected through these transparencies and similarly transformed into electrical impulses. (iii) Video tapes. Magnetic impulses (themselves resulting from transformation of electrical impulses derived from light) are stored on the tapes; these are transformed back into electrical impulses. The electrical signal from sources (i), (ii),

---

[1] For the similar exemption for domestic manufacturing corporations, see G. L. c. 63, § 38C, and G. L. c. 59, § 5, Sixteenth.

[2] The step of an application to the State Tax Commission was eliminated by St. 1978, c. 514, § 35, amending G. L. c. 58, § 2 (and the State Tax Commission was reorganized under the name Department of Revenue by St. 1978, c. 514, § 5).

[3] The record indicates that 67% of the 94% came from advertising aired during the company-produced programs.

and (iii), after a complicated process, reaches the television transmitting station in the form of a microwave signal. The microwave signal is changed into a one-volt electrical impulse which is built into a 60,300 watt signal; this is transformed into electromagnetic waves which, after modulation (superimposition on WBZ's frequency carrier wave), are radiated by the transmitter and received by the antennas of television receiving sets. (iv) Mobile units. The electrical impulses in the TV cameras are transformed by equipment in the mobile units into microwave signals; these emerge from further processing as a one-volt electrical signal with a sequence as above. (v) Network. These programs are received over telephone lines as electrical impulses; the signals are improved and converted into a microwave signal for treatment and broadcast by the transmitter as indicated above.[4]

The handling of sound for radio broadcast may be taken as comparable to the treatment of the element of sound for TV broadcast and is sketched briefly in the record thus. Sound — live or from records or audio tapes — is "shaped" and converted into electrical impulses which are sent over telephone lines to a transmitter. Through a process of modulation similar to that for the TV visual element, WBZ's radio signal is impressed on its carrier wave for transmission to the receiving sets. As to the company's radio operations, the stipulation adds that 98% of the programming was produced by the company, and 95% of the income was derived from advertising aired during that programming.

The names of the company's departments are indicative of the range of work, from preparing programs to the final broadcasts, carried out by the 317 company employees: news, technical, programming, prop, art, retail production, sales, administrative.[5]

---

[4] A sixth source or component is "character generator," a machine with a keyboard on which text is typed. As converted into electrical impulses, the text is mixed into the relevant transmissions.

[5] The company fabricates stage sets, and so forth, on which it mounts the programs it produces, but this kind of activity is no more "manufac-

2. The State Tax Commission's form of "Application for Classification of Corporation" asked for a description of the "actual manufacturing process or activity performed," and the company's answer, which may stand as an encapsulation of the present record, was the following. "TV broadcasting: optical information is changed into an electrical signal which is modified in many ways by the application of extremely complex technology, encoded and placed on the broadcaster's carrier and sent out to be received by a receiving set at a great distance. Radio broadcasting: acoustical energy is changed into an electrical signal and beamed through the broadcaster's carrier to receiving stations." We think the Appellate Tax Board cannot be held wrong as a matter of law (see *Hopkinton LNG Corp.* v. *State Tax Comm'n,* 372 Mass. 286, 288 [1977]) in deciding on the basis of such a submission that the company was not a manufacturer in the statutory sense.

We quote from *First Data Corp.* v. *State Tax Comm'n,* 371 Mass. 444 (1976): "As the statute does not itself effectively define 'manufacturing,' we have said that the Legislature should be supposed to have adopted the common meaning of the word, as assisted by a consideration of the historical origins of the enactment." *Id.* at 447. Popular understanding, we suggest, is approximated by the expression in *Commissioner of Corps. & Taxation* v. *Assessors of Boston,* 321 Mass. 90, 94 (1947): "Manufacture ordinarily and commonly denotes the process of transforming raw or finished materials by hand or machinery, and through human skill and knowledge, into something possessing a new nature and name and adapted to a new use." This statement can apply to the broadcasting process only by a considerable distortion of the meaning; the process is more naturally and more aptly described, in distinction to manufacture, as a transmission of intelligence. That is how we characterized the operation of the "commercial on-line,

ture" than the production of a play in the theatre. The claim of manufacture concentrates on the transformations culminating in the radiation of the signals to the receiving sets.

real-time computer time-sharing system" involved in the *First Data* case, to which the present case bears much resemblance, as do the cases indicating that the telephonic process, by which human sound is transformed into electrical impulses and those impulses changed back into cognizable sound, is not a process of manufacture. See *Assessors of Boston* v. *Commissioner of Corps. & Taxation,* 323 Mass. 730, 741 (1949); *Assessors of Springfield* v. *Commissioner of Corps. & Taxation,* 321 Mass. 186, 190-192 (1947). The Board in the present case did indeed allow a request for a ruling that "Westinghouse may not be denied manufacturing status merely because its end product is intangible." That proposition conformed to our view that the production of electricity may entail manufacture (see *Boston Gas Co.* v. *Assessors of Boston,* 334 Mass. 549, 565 [1956]; *Boston & Me. R.R.* v. *Billerica,* 262 Mass. 439, 449 [1928]), but it does not go far enough to resolve the question of manufacture here.

As to the historical origin of the legislation, we have pointed out that the exemption arose from an attempt to save the factories that had fallen into a distressed condition in the Commonwealth around 1936. Broadcasting is outside this matrix of intention and expectation. Cf. *Charles River Breeding Laboratories, Inc.* v. *State Tax Comm'n,* 374 Mass. 333, 336 (1978).

Decisions of other jurisdictions are not likely to have direct bearing because of peculiarities of the various taxing schemes. Yet it may be recorded as suggestive that Pennsylvania has lately held that the same company, in respect to its television and radio broadcasting in Pittsburgh through station KDKA, was not exempted by a provision of a "local tax enabling act" which barred municipalities from levying tax "on any privilege, act or transaction related to the business of manufacturing." *Golden Triangle Broadcasting, Inc.* v. *Pittsburgh,* 483 Pa. 525 (1979). See also *Commonwealth ex rel. Luckett* v. *WLEX-TV, Inc.,* 438 S.W.2d 520 (Ky. 1968);[6]

---

[6] This case uses an interesting image: "In the last analysis, the function of television is to transmit a message or communication. It manufactures

*Meredith Corp.* v. *State Tax Comm'n,* 23 Ariz. App. 152 (1975). But cf. *Tabulating Serv. Bureau, Inc.* v. *Commissioner of Taxation,* 295 Minn. 562 (1973).

The company attempts a constitutional argument based on the fact that two corporations publishing newspapers in Boston, with which the company competes for advertising, were classified by the Commissioner as manufacturing corporations. This is said to involve a breach of the guaranty of equal protection of the laws, the guaranty being perhaps the more sensitive here, it is suggested, because broadcasting and newspaper publishing are First Amendment activities. That the company is engaged in communication as a business of course does not exempt it constitutionally from local or other taxation. See *Opinion of the Justices,* 378 Mass. 816, 820-821 (1979). As to the claim of invidious discrimination because certain corporations publishing newspapers received the manufacturing classification while the company did not, we are unable on the present record to make any judgment because what, precisely, the entire business of the publisher corporations consisted of was not presented in any detail. Tax statutes customarily make narrow distinctions without running into trouble on a constitutional level, and application of a concept like "manufacture" necessarily involves close line-drawing.[7] The case of *Grosjean* v. *American Press Co.,* 297 U.S. 233 (1936), cited by the company, is not in point: the Court recognized and

---

messages in about the same sense that a common carrier manufactures travel." 438 S.W.2d at 523.

[7] *Golden Triangle Broadcasting, Inc.* v. *Pittsburgh,* cited in text, affirmed a judgment of the Pennsylvania Commonwealth Court, 31 Pa. Commw. Ct. 547 (1977). The opinion of the latter court reconciled its denial of exemption to the company, engaged in broadcasting, with its previous decision in *Pittsburgh* v. *Pittsburgh Press Co.,* 14 Pa. Commw. Ct. 551 (1974), allowing exemption to the publisher of a newspaper using its own presses and other machinery. See *Federal Communication Comm'n* v. *Pacifica Foundation,* 438 U.S. 726, 748 (1978). Cf. *Assessors of Boston* v. *Commissioner of Corps. & Taxation,* 323 Mass. 730, 739 (1949); *Hearst Corp. (News American Div.)* v. *State Dep't of Assessments & Taxation,* 269 Md. 625 (1973).

condemned a design to put the clamps on expression by newspapers — "a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." At 250.

We add, what we have had occasion to say before,[8] that the criterion of manufacture, as defined in the light of its historical provenience, may not serve the needs of the year 1981. But redefinition is for the Legislature.

The decision of the Appellate Tax Board is affirmed.

*So ordered.*

---

[8] See *First Data Corp.* v. *State Tax Comm'n,* 371 Mass. 444, 448 (1976); *Charles River Breeding Laboratories, Inc.* v. *State Tax Comm'n,* 374 Mass. 333, 336 (1978).