Argued and submitted February 9, reversed June 2, 1982

BAIN,
*Plaintiff-Respondent,*
*v.*
DEPARTMENT OF REVENUE,
*Defendant,*
OREGON AQUA-FOODS, INC.,
*Intervenor-Appellant.*

(No. 1393, SC 27849)

646 P2d 12

John C. Caldwell, Oregon City, argued the cause for intervenor-appellant. With him on the briefs was Hibbard, Caldwell, Bowerman, Schultz & Hergert, Oregon City.

Dana A. Anderson, Assistant County Counsel, Lane County Office of Legal Counsel, Eugene, argued the cause and filed the brief for plaintiff-respondent.

ROBERTS, J.

Denecke, C. J. dissented and filed an opinion.

Tanzer, J. dissented and filed an opinion.

### ROBERTS, J.

The Director of Assessment and Taxation for Lane County assessed an ad valorem property tax against a $4.7 million salmon hatchery operated by Oregon Aqua-Foods, Inc. (Aqua-Foods) for the tax year 1978-79. The Oregon Department of Revenue ordered the cancellation of the tax on the ground that the hatchery is a "manufacturing" facility for the purpose of the tax exemption provided in ORS 307.330 and ORS 307.340. The Oregon Tax Court determined that Aqua-Foods is not entitled to the exemption. The sole issue is whether the activity engaged in by Aqua-Foods is "manufacturing" entitling it to the tax exemption on certain improvements located on its land and used in its business.

The Tax Court adopted the statement of facts provided by the parties in their briefs to that court, and we do likewise.

" 'There is no dispute * * * [that Aqua-Foods] employs rather sophisticated mechanical, chemical and electronic processes in the commercial raising of salmon.

"* * * * *

" 'Petitioner produced two witnesses in its employ: Daniel A. Hartsook, Financial Manager, and William J. McNeil, General Manager and Vice President. Both gentlemen testified in great detail about the purposes, processes, and attributes of the subject property. Numerous photographic exhibits were produced.

" 'Petitioner is a wholly-owned subsidiary of Weyerhaeuser Corporation. It is described as an 'ocean ranching company.' The subject property is markedly dissimilar to normal and ordinary fish hatcheries and contains a rigorous environmental control system. It is the largest operation of its type in the world.

" 'Waste water is obtained from the nearby Weyerhaeuser pulp mill. This heated water is blended with cold water and disinfected by chlorination. The residual chlorination is later removed. Temperature control of the water is crucial; there are variations between each of the 36 raceways on the subject property. It is a computerized operation.

" 'The release and recapture sites are located on the Oregon coast. After entering the recapture site, the salmon

brood stock are held in salt water ponds until reaching maturity. This is from four to six weeks for Coho salmon. The eggs are then removed and artificially fertilized. These, then, are transported to the subject property in Springfield for incubation. Usually, they are then quarantined and held in isolation for approximately 21 days. Subsequently, they are placed in the hatchery raceways.

" 'The hatching, itself, was described in great technical detail. It is a highly complex and intriguing process. The release of a 'hatching enzyme' weakens the egg shell and the embryo escapes.

" 'A PhD in nutrition is on Petitioner's staff. Certain diets are essential; food is specially designed for Petitioner's operation. Pathology and research and development laboratories are present at the subject property. They are supported by groups in the state of Washington.

" 'Along with the disinfection of the water, all of the fish are vaccinated to protect against disease. More than 12 million juvenile salmon were vaccinated in 1978; more than 20 million were expected for 1979. Of all the fish released, over 500,000 were tagged for identification by Petitioner. The precise release dates are determined by observation, experimentation, and scientific techniques. The survival and actual return rates from the ocean after release are much greater for Petitioner's operation than occurs in nature.

" 'Because of the disease prevention measures undertaken, Petitioner's salmon are much more resistant than those produced in nature. Petitioner's products may be differentiated by their bone structure. Petitioner's witness testified that the quality of the subject property's salmon is much greater than 'natural' fish; more survive to be harvested. Additionally, much better growth rates are obtained due to the specialized dietary measures. At the subject property, a salmon may double its body size approximately every 20 days.

" 'The respondent produced no witnesses. Instead, he relied solely on legal arguments with no dispute as to Petitioner's factual testimony about the complex, technical process.' "

ORS 307.330 provides:

"(1) Except for property centrally assessed by the Department of Revenue, each new building or structure or addition to an existing building or structure is exempt

from taxation for each year of not more than two consecutive years if the building, structure or addition:

"(a)   Is in the process of construction on January 1;

"(b)   Is not in use or occupancy on January 1;

"(c)   Has not been in use or occupancy at any time prior to such January 1 date;

"(d)   Is being constructed in furtherance of the production of income; and

"(e)   Is, in the case of nonmanufacturing facilities, to be first used or occupied not less than one year from the time construction commences. Construction shall not be deemed to have commenced until after demolition, if any, is completed.

"(2)   If the property otherwise qualifies for exemption under this section and ORS 307.340, the exemption shall likewise apply to any machinery or equipment located at the construction site which is or will be installed in or affixed to such building, structure or addition.

ORS 307.340 provides:

"The property described in ORS 307.330 shall be listed for ad valorem taxation, but the assessor shall cancel the assessment upon receipt of sufficient documentary proof that the property meets all of the conditions contained in ORS 307.330. Such proof shall be filed with the assessor on or before April 1 of each year. No cancellation of assessment shall be made unless the required proof is filed within the time prescribed by this section. Any cancellation of assessment will be abated as to any nonmanufacturing property that is used or occupied within one year from the time construction commences and the assessor shall proceed to correct the assessment and tax roll or rolls from which the property was omitted from taxation, in the manner provided in ORS 311.207 to 311.213."

The parties agree that the property met the requirements of ORS 307.330(1)(a),(b),(c) and (d). Because the Aqua-Foods hatchery was used and occupied less than a year from the time its construction began, the hatchery qualifies for a tax exemption only if the production of fish conducted there cannot be construed to be "nonmanufacturing." ORS 307.330(1)(e) excludes from the exemption a nonmanufacturing facility used or occupied less than a year from the time its construction commenced. As the tax

court noted, "[i]f the subject property is a 'nonmanufacturing' facility, no tax exemption can be granted." 9 OTR at 35.[1]

The order issued by the Department of Revenue was based primarily on cases from other jurisdictions, *e.g.*, a fish hatchery held to be manufacturing, *Miller v. Peck,* 158 Ohio St 17, 106 NE 2d 776 (1952); making of beer held to be manufacturing because it required the application of labor, skill, or sophisticated machinery, *Anheuser-Busch Assn. v. U.S.,* 207 US 556, 28 S Ct 204, 52 L Ed 336 (1908); and a chicken hatchery held to be a manufacturing enterprise, *Master Hatcheries, Inc. v. Coble,* 286 NC 518, 212 SE 2d 150 (1975). The one Oregon case relied upon by the Department was cited for the proposition that "manufacturing" occurs with the fermentation from grape juice to wine, *State v. Marastoni,* 85 Or 37, 165 P 1177 (1917). *Marastoni* was a case in which the defendant was prosecuted for violating a statute prohibiting the manufacture of intoxicating wine.

The Department's order recites:

"After reviewing all the evidence and the numerous authorities cited by the parties, it is my considered opinion that the optimum temperature regime and highly technological controls carried out at the subject property are, indeed, a manufacturing process. Petitioner's operations are quite dissimilar to what occurs in nature or even at a 'normal' hatchery. The weight of the evidence establishes that Petitioner accelerates the basic physiological processes and produces a much better end product, both as to quality and quantity."

---

[1] The opinion of the Tax Court stated that, despite the fact that the word "manufacture" does not appear in ORS 307.330 or ORS 307.340, Aqua-Foods' tax exemption depended on a showing that the hatchery was a manufacturing facility:

"The word 'manufacturing' appeared in the original statute (Or Law 1959, ch 246). It was not used in the legislative amendment found in Or Laws 1961, ch 552, but the parties herein accept 'manufacturing' to be the converse of 'nonmanufacturing,' which word was retained in the applicable amended statute. Consequently, only if the property is proved to be a manufacturing facility, as contended by defendant and intervenor, is the tax exemption applicable." 9 OTR at 35.

The Tax Court, on appeal, concluded that many of the decisions relied upon by the Department in interpreting the terms "manufacturing" or "manufacture" were guided by "differing and often very broad statutory definitions."[2] The Oregon statutes in question here contain no definitions of "nonmanufacturing" or its converse, which the parties and the tax court agreed must be "manufacturing." The Tax Court reasoned that, in the absence of a definition,

> "The words used must therefore be regarded as common words and not words of art. When a common term is used in the statute, it should be given its common meaning. The legislature's failure to consider or deal with the particular problem will not prevent courts from construing a legislative act as having a meaning which is consistent with common sense and with the overall purpose of the act. *State v. Shumway,* 44 Or App 657, 607 P2d 191 (1980). In interpreting a statute, the court must begin with the language used and is bound to give words of common usage their natural, ordinary meaning unless that leads to an absurd or unreasonable result. *Photo-Art Commercial Studios, Inc. v. Hunter,* 42 Or App 207, 600 P2d 471 (1979); *Oregon Oyster Co. v. Dept. of Rev.,* 7 OTR 308 (1978). Words of common use are to be given their natural, plain and obvious meaning, rather than any curious, narrow or hidden sense. *Portland Gen. Elec. Co. v. Dept. of Rev.* 7 OTR 36-37 (1977)."[3]

The Tax Court therefore did not consider any legislative intent in the enactment of ORS 307.330 and 307.340 in concluding:

> "[i]t appears to the court that the intervenor in the present suit is as much entitled to a tax exemption as other

---

[2] For cases relying on statutory definitions *See Continental Coffee Co. v. Bowers,* 174 Ohio St 435, 189 NE2d 901 (1963); *Red Top Brewing Co. v. Bowers,* 163 Ohio St 18, 125 NE2d 188 (1955); *Miller v. Peck,* 158 Ohio St 17, 106 NE 2d 776 (1952); as well as *Continental Coffee Company of Washington v. State,* 62 Wash2d 829, 384 P2d 862 (1963); *McDonnell & McDonnell v. State,* 62 Wash2d 553, 383 P2d 905 (1963); and *Bornstein Sea Foods, Inc. v. State,* 60 Wash2d 169, 373 P2d 483 (1962), considering both statutory definition and tax rule.

[3] The word "manufacturing" appears in Oregon Revised Statutes 130 times; the total for all derivatives of the word "manufacture" in the possessive, plural and past tenses is 810 times. The term "manufacturer" is defined five times and "manufacture" three times: at ORS 475.005(14), relating to controlled substances; ORS 633.006(14), relating to animal feed; and ORS 689.005(20), relating to pharmaceutical drugs.

parties to whom the exemption is readily granted * * * but that close adherence to the rules of statutory construction prohibits this court from so finding."

■ ■ The fact that a statute does not contain a definition of one of its terms does not automatically make that term one of plain or common meaning. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980). In *Springfield* this court identified three classes of statutory terms: exact terms or terms of precise meaning, such as male, rodent and 30 days; ·inexact terms, *e.g.,* employee; and terms of delegation, *e.g.,* fair, undue, unreasonable, in which an agency is given the authority to refine and execute generally expressed legislative policy. 290 Or at 223, 225, 228. Inexact terms, we said, were characterized in *McPherson v. Employment Div.,* 285 Or 541, 591 P2d 1381 (1979), as

"embodying complete expressions of legislative meaning, even though that meaning may not always be obvious." 290 Or at 224.

We noted:

"Whether certain things are included will depend upon what the user intended to communicate or accomplish by the use of the word. To determine the intended meaning of inexact statutory terms, in cases where their applicability may be questionable, courts tend to look to extrinsic indicators such as the context of the statutory term, legislative history, a cornucopia of rules of construction, and their own intuitive sense of the meaning which legislators probably intended to communicate by use of the particular word or phrase. In any event, however, the inquiry remains the same: what did the legislature intend by using the term." 290 Or at 224.

Because we find the term "nonmanufacturing" in ORS 307.330(1)(e) to be ambiguous or inexact, it is our duty to interpret the statute in such a manner as to be consistent with the intention of the legislature. ORS 174.020.

The legislative history of ORS 307.330 and its amendments abounds with comments indicating that the purpose of the statute is to promote the economy of Oregon by offering an aid in attracting and developing new industries to the state. *See* Minutes, Senate Taxation Committee, April 2, 1959; Minutes, House Taxation Committee,

April 19, 1961. For example, testifying on behalf of the original bill, enacted in 1959 as Or Laws Ch 246, a representative of the State Planning and Development Department testified that the tax exemption, if enacted, would be used in national advertising to attract industrial development to Oregon. At the 1961 House Taxation Committee hearing on proposed amendments, a member of the Governor's Advisory Council for the Department of Planning and Development stated the purpose of the exemption was to attract new industry to the state. The Tax Court itself has said previously "[t]here seems to be little doubt that the legislature, in enacting ORS 307.330, wished to encourage and promote manufacturing industry in Oregon." *Aero Air, Inc. v. Dept. of Rev.,* 8 OTR 461, 464 (1980).

The 1959 bill provided that the exemption was available, under the same conditions now specified, for a building, structure or addition "[b]eing constructed primarily for use in manufacturing, processing or assembling materials into products for purposes of sale." ORS 307.330 was amended by 1961 Or Laws Ch 552, which removed the "manufacturing, processing or assembling" language and inserted the language now appearing at subsection (1)(e). Minutes of the Senate and House Taxation Committees for 1961 show that the Senate bill to amend ORS 307.330 initially proposed adding to the original manufacturing exemption "commercial facilities requiring a capital investment of not less than five million dollars," Minutes, Senate Taxation Committee, March 17, 1961, p. 1. When the proposed Senate bill reached the House Taxation Committee, Representative Barton, who introduced the original 1959 legislation, opined that the bill as amended by the Senate would include any size or type of building constructed to produce income, and gave the example of a Safeway store, and urged the adoption of an amendment imposing a one-year construction qualification. The "commercial facility" language was not enacted.

It is a logical interpretation, therefore, of the "nonmanufacturing" provision of ORS 307.330(1)(e), enacted in 1961, derived as it is from the "commercial facility" language originally proposed, to conclude that nonmanufacturing was meant to refer to income-producing enterprises other than manufacturing, such as commerce, agriculture,

mining, finance, insurance, real estate and services. This was the interpretation placed upon the Senate bill by the Department of Planning and Development. *See* Statement of the Department of Planning and Development before the [House] Tax Committee on SB 416, April 19, 1961. Aqua-Foods' hatchery operation does not fit easily into any of these "nonmanufacturing" categories.

Respondent has suggested that the fish hatchery is more akin to agriculture, *e.g.,* to the breeding and raising of farm animals, than it is to manufacturing. We conclude that it is not agriculture. The word "agriculture" is derived from two Latin words: "ager" meaning "field," and "cultura" meaning "cultivation." Websters Third New International Dictionary (1976). One common definition of "agriculture" is "the science or art of cultivating the soil, harvesting crops, and raising livestock"; it is also described in Websters, *supra,* as "the science or art of the production of plants and animals useful to man * * *." The latter definition, however, considered in light of the origin of the word, relates "the production of plants and animals" to the land. Given the state of the art, or science, of agriculture in 1961, it is doubtful that the legislature which amended ORS 307.330 to include the "nonmanufacturing" language would have considered Aqua-Foods' activities to be agriculture, or any other nonmanufacturing use. The property is therefore not subject to the use or occupancy time constraints of ORS 307.330(1)(e).

■    We find the hatchery operated by Aqua-Foods is sufficiently akin to a manufacturing facility to bring it within the general tax exemption provided by ORS 307.330(1). Like other courts faced with this same definitional problem, we have taken into account the use of highly complex equipment and processes such as the mechanical, chemical and electronic processes employed here. *See Master Hatcheries, Inc. v. Coble, supra; Perdue Foods, Inc. v. State Department of Assessment & Tax.,* 264 M 672, 288 A2d 170 (1972); Annot., 17 ALR 3d § 9, 33-34 (1968).[4] We have also examined the reasoning of two other

---

[4] *Cf. Peterson Produce Company v. Cheney,* 237 Ark 600, 374 SW2d 809 (1964) (chicken hatchery); *Perdue, Inc. v. State Department of Assess. & Tax,* 264 Md 228, 286 A2d 165 (1972) (chicken hatchery).

courts which have interpreted similar tax exemption statutes to accomplish stated legislative objectives similar to those of our legislature: to encourage and promote industry in Oregon.

In *Perdue Foods, Inc. v. State Department of Assessment & Tax, supra,* the Maryland Court of Appeals, after describing in graphic detail the operation of a chicken processing plant which begins with the delivery of live chickens and ends with chickens packaged for market, at the rate of 12,000 chickens per hour, held such a process to be "manufacturing" within the meaning of the state tax statute allowing an exemption for materials and machinery used in manufacturing. The court, quoting from the ruling Maryland case, *Commissioners of Carroll County v. B.F. Shriver Co.,* 146 Md. 412, 126 A. 71 (1924), said, "* * * it was foreign to the intention of the Legislature that the industry here involved should not be regarded as a manufacturing industry within the meaning of that law * * *." 288 A2d at 172. The court in *Perdue* gave considerable weight to the announced purpose of the tax exemption statute, which set forth in its title the intention "to encourage the development of manufacturing industries in the State of Maryland." 288 A2d at 173, 179, citing *Carroll County, supra.* Of additional importance was the fact that in the nearly half century between *Carroll County* and *Perdue,* though the Maryland legislature had amended the tax exemption statute several times, it had never attempted to generally define the terms "manufacturer" or "manufacturing."

Similarly, the Supreme Judicial Court of Massachusetts, in *Charles River, etc. v. State Tax Com'n.,* 374 Mass 333, 372 NE2d 768 (1978), relying on the legislative intent behind its 1936 tax exemption statute, held that the breeding of animals for biomedical research was not "manufacturing." While it considered the word "manufacturing" in the applicable statutes "according to its natural and ordinary meaning," 372 NE2d at 769, the court also said:

> "We have also been guided in determining the scope of the word 'manufacturing' by a consideration of the legislative purposes behind the creation of this special tax treatment. The statutory purpose of attracting new manufacturing corporations and aiding 'mills and factories' which

were falling into decline in 1936 does not strengthen Charles River's claim. The statutory goal was not to encourage and preserve all industry in the Commonwealth but only that portion of industry represented by manufacturing corporations." 372 NE2d at 770. (Citations omitted.)

We note that the North Carolina Supreme Court in *Master Hatcheries, Inc. v. Coble, supra,* held that a commercial chicken hatchery employing highly complex incubation equipment to produce 300,000 chicks a week was a "manufacturing industry," where its statute allowed a reduced tax on certain machinery used by manufacturing plants, but did not include a definition of the term. The court said

"It is everywhere conceded that the term 'manufacturing' as used in tax statutes is not susceptible of an exact and all-embracing definition, for it has many applications and meanings." 212 SE2d 151.

The Supreme Court in *Master Hatcheries* relied upon the previous opinion of the North Carolina Court of Appeals which said

"What constitutes manufacturing or who is a manufacturer within the meaning of a tax statute may well depend upon the terms of the specific statute involved and the circumstances of a particular case * * * [I]t is impossible to make a clearcut distinction between industrial processes which make use of living organisms and those which do not. In a tax statute, the general terms used by the legislature, such as 'manufacturing,' frequently cannot be defined with complete precision." *Master Hatcheries, Inc. v. Coble,* 21 NC App 256, 204 SE2d 395, 397 (1974), *aff'd,* 286 NC 518, 212 SE2d 150 (1975).

Unlike these courts, we are called upon to give meaning, not to a test that a taxpayer's activity must be shown to be "manufacturing," but to an exception for activities shown to be "nonmanufacturing." We conclude as a matter of law that the activities conducted by Aqua-Foods at its salmon hatchery were not excluded as "nonmanufacturing" from the tax exemption authorized by ORS 307.330. The industry is one which promotes the economic objectives of the legislature which enacted ORS 307.330 and 307.340. Unlike the statute construed in *Charles River,* ORS 307.330, as amended in 1961, indicates a legislative intent to encourage industry of all types to come to Oregon

by allowing a limited property tax exemption for new construction undertaken "in furtherance of the production of income." ORS 307.330(1)(d).

It is apparent that the Aqua-Foods' hatchery represents the type of economic development the legislature meant to encourage by enacting ORS 307.330 and its amendments. The enhancement of the salmon runs in Oregon is, certainly, at least as important a contribution to the economic health of this state as chicken hatcheries are to other states.[5]

Based on our consideration of the legislative intent to provide industrial tax exemptions in order to promote the economy of Oregon, coupled with the technological and scientific complexity of operation involved here, we hold the Aqua-Foods' salmon hatchery is an income-producing industrial facility other than a nonmanufacturing facility, and entitled to the tax exemption provided in ORS 307.330.[6]

Reversed.

**DENECKE, C. J.,** dissenting.

I concur in Justice Tanzer's dissenting opinion except for the first and last sentences of the last paragraph.

**TANZER, J.,** dissenting.

The majority holds that Aqua-Foods manufactures fish. I cannot concur.

---

[5] *See Master Hatcheries, Inc. v. Coble,* 21 NC App 256, 204 SE2d 395 (1974), *aff'd* 286 NC 518, 212 SE2d 150 (1975), as to the economic importance of chickens.

[6] We note therefore our approval of the dissenting opinion in *Golden Triangle etc. v. City of Pittsburgh,* (Larsen, J., dissenting), 483 Pa 525, 537, 397 A2d 1147 (1979) which said:

"The courts, in their development of standards for determining whether or not a particular enterprise is engaged in manufacturing, should be concerned with achieving that legislative objective. To that end, the standards must be flexible and the courts must be willing to adapt the standard to comport with rapid technological and scientific progress. As research and development in countless areas produces techniques and processes that may have been hitherto unheard of, we must not rigidly bind ourselves to outmoded concepts * * *. As the 'Star Trek' era is ushered into our lives, the Court must be prepared to keep its perspectives progressive and its definitions flexible, or else the Commonwealth will fail to acquire modern, technological manufacturing operations."

The legislature enacted ORS 307.330, in the words of the majority, "to provide industrial tax exemptions in order to promote the economy of Oregon" or, stated otherwise, "to encourage industry of all types to come to Oregon by allowing a limited property tax exemption for new construction undertaken 'in furtherance of the production of income.'" 293 Or at 174-75. In pursuance of that statutory objective, two distinct classes of new construction were given tax advantages. The statute gave a one-year tax exemption for structures used for "nonmanufacturing" purposes and a two-year exemption for others.

Aqua-Foods built a fish hatchery. It is a technologically advanced fish hatchery, but it is still a fish hatchery. Like many other fish hatchers, Aqua-Foods hatches eggs, provides water and food, and catches fish. Although Aqua-Foods does this in a sophisticated manner, the essential process is the same.

As the majority holds, Aqua-Foods' operation appears to be the sort of new industry which ORS 307.330 is intended to promote and the structures qualify for tax exemption under the statute. The next question, however, is whether it qualifies for the standard two-year exemption or only for the one-year exemption accorded to "nonmanufacturing" industries. On this question, the majority goes awry.

I cannot agree that the legislature intended that we regard fish hatching and catching as manufacturing. That conclusion is contrary to the common understanding that "manufacturing" refers to making things by hand or, in more advanced times, to fabrication, possibly aided by division of labor and use of machines. *See* Webster's New International Dictionary (2d ed 1940). Someday, civilization's progress in genetic and biochemical engineering may enable humans to handmake or fabricate fish, but as yet Aqua-Foods claims no such power. Aqua-Foods does not claim to actually manufacture fish; it merely provides optimum conditions for nature to take its course.

Nobody argues that the legislature intended "nonmanufacturing" as a term of art in tax law different from ordinary understanding, although the majority strains to

do so. The majority asserts that the term "nonmanufacturing" is "inexact" and, pursuant to *Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980), looks to the legislative policy behind the term. Some processes may present a difficult definitional problem *(e.g.,* brewing beer and cultivating vaccines), but hatching and catching fish is not on the inexact definitional edges of the term. There is no need here to resort to extrinsic definitional aids.

The majority classifies Aqua-Foods' hatchery as manufacturing because its "use of highly complex equipment and processes such as the mechanical, chemical and electronic processes employed here" is consistent with the legislative objective "to encourage and promote industry in Oregon." 293 Or at 173. The fallacy in this is that technology is no evidence as to which classification applies because both manufacturing and nonmanufacturing facilities may employ advanced technology. To demonstrate, we may look to the majority's list of "commerce, agriculture, mining, finance, insurance, real estate and services" as examples of nonmanufacturing. 293 Or at 171-72. Application of advanced technology to the growing and harvesting of tomatoes, for example, would not convert that agricultural enterprise from nonmanufacturing to manufacturing. Israeli tomatoes, although the product of intensely technological cultivation unheard of in 1961 when ORS 307.330 was enacted are no more handmade or fabricated than are primitively cultivated tomatoes or, for that matter, Aqua-Foods' fish. Similarly, the finance industry has undergone an electronic revolution since 1961, but it is nevertheless still a nonmanufacturing industry just as if it was operated from vest-pockets and strongboxes. The essentially nonmanufacturing nature of these industries is unchanged by increased application of technology, and so it is with fish hatching and catching. This distinction by the majority is erroneous.

I mention technological changes since 1961 because the majority reasons:

"* * * Given the state of the art, or science, of agriculture in 1961, it is doubtful that the legislature which amended ORS 307.330 to include the 'nonmanufacturing'

language would have considered Aqua-Foods' activities to be agriculture, or any other nonmanufacturing use. * * *"
293 Or at 172.

Unanticipated technological advances do not convert non-manufacturing industries into manufacturing. Were it otherwise, then the majority should be prepared to determine at what degree of technological development fish farming becomes fish manufacturing. Of course, they cannot, because the basic logic is flawed. The distinction depends on the nature of the enterprise, not, as the majority holds, on the devices with which it is carried out.

With all respect, I believe the majority opinion reflects the fact that innovative jurisprudence satisfies the judicial need for creativity in a way that straightforward decision-making often does not. That may also account for the chicken cases from elsewhere upon which the majority relies. I would reject them and accept the reasoning quoted by the majority from *Charles River, etc. v. State Tax Com'n.,* 374 Mass 333, 372 NE2d 768 (1978). The straightforward course may not be as good for the judicial soul, but it reflects a higher regard for the will of the legislature and generally makes for better law.