**L & R EGG COMPANY, INC.,** Petitioner–Appellant,

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI, Respondent.**

No. 72488.

Supreme Court of Missouri, En Banc.

Oct. 16, 1990.

Dale L. Davis, Leland C. Bussell, Springfield, for petitioner-appellant.

William L. Webster, Atty. Gen., Carole Lewis Iles, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Appeal from the decision of the Administrative Hearing Commission to uphold the Director of Revenue's assessment of a use

tax upon egg processing equipment purchased by Petitioner–Appellant, L & R Egg Company (appellant).

The sole question before the Court is whether equipment used to clean, oil, inspect, weigh, grade, pack and mark chicken eggs is "manufacturing" equipment, within the meaning of § 144.030.2(5), RSMo 1986, so as to exempt Appellant from payment of use tax on that equipment. The Commission found that it is not manufacturing equipment. Affirmed.

The facts are not disputed. Appellant purchases eggs from farmers, then processes and sells the eggs to retailers. To expand and modernize operations, Appellant purchased and installed an air door and an egg processing system, but paid neither sales nor use tax on either. Following an audit, the Director of Revenue assessed a use tax on both.

When eggs are delivered to appellant's plant, they are sent through the air door into a cooler for storage before processing. The air door blows a constant stream of air over the eggs as they enter, keeping the warm, outside air from entering the cooler, and permitting the cooler door to remain open for ready access.

The egg processing system handles several tasks. A conveyor transports stacked flats of eggs to the pre-loader, which sends flats to the loader individually. The loader consists of a series of suction cups, which pick up the eggs and place them on spool bars. The empty flats are then conveyed to washing and stacking areas.

Once on the spool bars, the eggs are conveyed through the washer to be sprayed and scrubbed. The temperature of the washing compound is 15 degrees warmer than the eggs' interiors to prevent contaminants from entering through the porous egg shells. The eggs are then rinsed, air dried, and coated with mineral oil to replace the natural sealant lost during washing. The oil retards spoilage.

The eggs are next conveyed to the pre-candle area where a worker removes stained, dirty or leaking eggs. The remaining eggs are conveyed to the candle booth and pass over a 12,000 watt light source.

A worker inspects the eggs and, using an electric wand, removes those with cracks or blood spots.

The remaining eggs are weighed individually by computer, and segregated by weight into classes. They are then conveyed to the packing area, packed, and the cartons stamped with the required dates and codes. The cartons are conveyed to a packaging station, where they are manually packed into cases, then conveyed to an automatic sealer for taping. Finally, each case is marked with the date, grade and size of the eggs, and packer identification number. The cases are stored in a cooler prior to shipping.

This processing does not affect the contents of the eggs. The equipment has, however, enabled appellant to double its annual output.

Construction of Missouri revenue law is a matter for the Court's exclusive appellate jurisdiction. *Mo. Const. art. V, § 3.* The Court reviews the Administrative Hearing Commission's interpretation of revenue law *de novo, Jackson Excavating Co. v. Administrative Hearing Commission,* 646 S.W.2d 48, 49 (Mo.1983), and must affirm the decision of the Commission "if supported by the law and competent and substantial evidence on the whole record, and ... not clearly contrary to the reasonable expectations of the General Assembly." *GTE Automatic Electric v. Director of Revenue,* 780 S.W.2d 49, 50 (Mo. banc 1989), and § 621.193, RSMo 1986.

While it is true that tax exemptions are generally construed against the party claiming the exemption, *GTE,* 780 S.W.2d at 50, the proper starting point for analysis is the plain language of the tax statute itself. *See State ex rel. Union Electric Co. v. Goldberg,* 578 S.W.2d 921, 923 (Mo. banc 1979). The Court will not construe a statute so as to wrench from it a result not intended by the legislature, and inconsistent with the import of the language of the statute. *Union Electric,* 578 S.W.2d at 923.

*Section 144.030.2(5)* provides an exemption from use tax for:

Machinery and equipment, ... purchased and used ... to expand existing manufacturing ... plants in the State if such machinery and equipment is used directly in manufacturing ... a product which is intended to be sold ultimately for final use or consumption. (emphasis added)

The issue of definition of the term "manufacturing," in the context of the above statute, has arisen before. This everyday term, however, has defied convenient interpretation, because its applications and meanings vary with the factual settings in which it is used. *State ex rel. AMF, Inc. v. Spradling*, 518 S.W.2d 58, 60 (Mo.1974).

"Manufacturing" has been defined as a process which changes and adapts something practically unsuitable for any common use into something suitable for common use. *West Lake Quarry & Material Co. v. Schaffner*, 451 S.W.2d 140, 143 (Mo. 1970). It has been defined as the production of new and different articles, by the use of machinery, labor and skill, in forms suitable for new applications. *Heidelberg Central, Inc. v. Director of Revenue*, 476 S.W.2d 502, 506 (Mo.1972). It is a process which "makes more than a superficial change in the original substance; it causes a substantial transformation in quality and adaptability and creates an end product quite different from the original." *Jackson Excavating Co. v. Administrative Hearing Commission*, 646 S.W.2d 48, 51 (Mo.1983).

Regardless of the definitional variation used, the processing through which appellant puts the eggs which it obtains from the farmers cannot be called "manufacturing" in any ordinary sense of the word. Neither city-dwellers nor country folks would consider an egg, just gathered from the hen's nest, unsuitable for common use to begin with. It can be eaten, sold from the back of the farmer's truck, or even incubated. Appellant thus fails the *West Lake Quarry* definition.

Nor are the *Heidelberg* and *Jackson Excavating* definitions met. Logic is strained

to suggest that by appellant's use of the air door and processing system, the clean and neatly packaged eggs have taken on forms suitable for new applications, or are an end product quite different from the original.

Appellant argues, given the fungible nature of the product, that if the focus of inquiry is properly placed on the processed batches of eggs as a whole, rather than on the individual egg, then the egg processing must be "manufacturing" within the meaning of *§ 144.030.2(5)*. Appellant also places great emphasis on the regulation of the egg industry. The original product is a batch of dirty, unpackaged and partly inedible eggs, while the end product is a batch of clean, properly packaged and entirely edible eggs. Therefore, appellant argues, the end product is both quite different from the original, and suitable for new application, that is, it can be legally sold by appellant.[1]

The logic is tempting, but unravels with a few tugs. First, the Court held in *Unitog Rental Services, Inc., v. Director of Revenue*, 779 S.W.2d 568, 570 (Mo. banc 1989), that the common thread in the definition cases is that manufacturing involves the "production of an article with a new use different from its original use." The fundamental "use" for a batch of eggs when it arrives at appellant's plant and when it leaves is the same—consumption. Appellant's efforts make little difference in the way in which consumers use the eggs. *Compare Jackson Excavating Co. v. Administrative Hearing Commission*, 646 S.W.2d 48, 51 (Mo.1983) (water purification process "creates" water fit for human consumption; process is manufacturing). The same is true if the focus is on the individual egg.

Second, whether edible or inedible, an egg which goes through appellant's processing is not itself changed; it is simply washed and the natural sealant which is lost during washing is replaced with miner-

---

1. Missouri and federal law mandate numerous strict grading and packaging requirements for egg sellers. *See* § 196.311 *et seq.*, RSMo 1986; 2 CSR 30–36.010, *et seq.*; 2 CSR 90–36.010, *et seq.*; and 21 U.S.C. sec. 1031, *et seq.* (1984).

al oil. Washing is not manufacturing. *See Unitog*, 779 S.W.2d 568.

Third, an inedible egg is not made edible by appellant's efforts; it is simply culled. Discarding such an egg is not manufacturing. Similarly, although it is true that the quality of the batch of eggs as a whole is improved when appellant culls the inedible eggs, this ".change" does not constitute manufacturing in the ordinary sense of the word. While manufacturing implies a change, not every change is manufacturing. *State ex rel. AMF, Inc. v. Spradling*, 518 S.W.2d 58, 62 (Mo.1974), and *Anheuser–Busch Brewing Assoc. v. United States*, 207 U.S. 556, 562, 28 S.Ct. 204, 206, 52 L.Ed. 336, 338 (1908) (to examine, sort, wash, steam, worm, brand, treat and dry imported corks changes them, but is not the "manufacturing" of corks).

Fourth, regulation of the egg industry does not convert steps taken to comply with those regulations into manufacturing processes. In *Jackson Excavating Co. v. Administrative Hearing Commission*, 646 S.W.2d 48, 51 (Mo.1983), the Court noted the state's heavy regulation of drinking water in order to reject the Commission's overly simple argument that "water is [just] water," and therefore the purification of impotable water could not be "manufacturing" in the context of the tax exemption statute. In holding that the water purification process was manufacturing, however, the Court examined and relied on the process itself, not the regulation of the process.

The crux of the determination of whether appellant's processing is manufacturing must be the nature of the enterprise itself, not the attendant regulations. *See Bain v. Department of Revenue*, 293 Or. 163, 646 P.2d 12, 20 (1982) (Tanzer, J., dissenting). That the egg industry regulations are in place, in large part, for the protection of public health and safety, *Mueller v. Burchfield*, 218 S.W.2d 180, 183 (Mo.App.1949), *aff'd.* 359 Mo. 876, 224 S.W.2d 87 (1949), does not change the result.

Decision affirmed.

BLACKMAR, C.J., and ROBERTSON, HIGGINS and COVINGTON, JJ., concur.

HOLSTEIN, J., dissents in separate opinion filed.

RENDLEN, J., dissents and concurs in dissenting opinion of HOLSTEIN, J.

HOLSTEIN, Judge, dissenting.

I respectfully dissent.

I believe the record clearly shows that the egg which leaves appellant's factory has undergone a "substantial transformation in quality and adaptability and [is] an end product quite different from the original." I would further find that the egg coming from appellant's processing machine has a new use different from its original use. That is to say, it may be sold to consumers. § 196.311, RSMo 1986, *et seq.*

This Court has determined that the clear legislative purpose for the enactment of § 144.030.2(5) was to encourage economic development. *West Lake Quarry and Material Co., Inc. v. Schaffner*, 451 S.W.2d 140, 142 (Mo.1970). Once the clear legislative intent is determined, that purpose should not be thwarted by artificial rules of narrow construction. *Lastra v. Intercontinental Investments Co., Inc.*, 745 S.W.2d 703, 705 (Mo.App.1987).

From time immemorial, hens have been thought of as the manufacturer—the exclusive manufacturer of eggs. But, despite the hen's best efforts, she has been unable to manufacture eggs that are uniform in size, color, and quality. At the risk of sounding indelicate, the hen's method of delivery does not always result in the most sanitary or aesthetically pleasing product.

The lawmakers and regulators have responded by damning the sale of the hen's random and unclean product from the grocery shelf. § 196.311, *et seq.*, RSMo 1986; 2 CSR 30–36.010, *et seq.;* 2 CSR 90–36.010, *et seq.;* and 21 U.S.C. sec. 1031, *et seq.* (1984). No expertise in preventive medicine is necessary to understand that if eggs remain unwashed, they will likely come into close contact with other foods or the hands of the food preparer. The potential for

contamination is of sufficient magnitude to justify regulation by both the state and federal government. In addition, consumers have come to believe that eggs should be free of the external contaminants to which eggs are exposed by the uncircumspect hen or the rogue rooster. The egg, as it is manufactured by the hen, is incomplete and requires additional processing to satisfy the law, the regulator and the consumer.

The appellant has provided the equipment to complete what the hen began. The result is a wholesome, sanitary, uniform and readily marketable product which satisfies the demands of both the consumer and the sovereign. The change in the egg effected by appellant's machine may seem modest; but without the modification the egg which comes from the farm would be no more saleable in today's marketplace than would water freshly drawn from a farm well, beef just butchered in a barn, or milk just taken from the cow.

The cases construing the meaning of manufacturing as the word is used in § 144.030.2(5) appear to be in disarray; but on closer examination the cases may be separated into two categories. In those cases in which a machine is used as part of the cycle of repair, restoration or cleaning *after* the finished product has reached the consumer, the machine is held not to be manufacturing equipment. *Unitog Rental Services, Inc. v. Director of Revenue*, 779 S.W.2d 568 (Mo. banc 1989); *State ex rel. AMF v. Spradling*, 518 S.W.2d 58 (Mo. 1974).[1] In contrast, when a machine modifies a raw product *before* reaching the consumer so that the product has a use and value it did not have prior to the modification, the machine is considered manufacturing equipment. *Jackson Excavating Co. v. Administrative Hearing Commission*, 646 S.W.2d 48 (Mo.1983); *Heidelberg Central, Inc. v. Director, Dept. of Revenue*, 476 S.W.2d 502 (Mo.1972); *West Lake Quarry and Material Co., Inc. v. Schaffner*, 451

S.W.2d at 140. Appellant's machine clearly falls into the second category.

The majority distinguishes this case from *Jackson* because a machine which purifies water "creates" water meeting legal standards of potability. No one could seriously contend that the machine in *Jackson* created water. The machine merely removed impurities and added chemicals so the water would meet a regulatory standard. The machine here also removes impurities and adds mineral oil so the eggs will meet government standards. The fact that impurities are removed from outside the egg, rather than inside, is not a meaningful basis of distinction. The holding in *Jackson* is applicable here.

In *Heidelberg* the taxpayer's machine printed ink onto paper. In *West Lake Quarry* the machine crushed large rocks into small rocks. Neither of those cases involved any complex alchemy which would distinguish them from this case. If those machines are treated as manufacturing equipment, no reason exists that appellant's machine should be treated differently.

From all the varying definitions of manufacturing noted by the majority, it is apparent that today's decision does not put the question to rest; we will see it again. As the majority opinion notes, the meaning of the word "manufacturing" has defied convenient interpretation. I would urge the legislature to step in and make the meaning of the exemption clear. Perhaps that will terminate the case-by-case method of defining the word. In the meantime, I would reverse the decision of the Administrative Hearing Commission and construe the exemption for manufacturing equipment to include appellant's machine.

---

1. The *AMF* case involved a machine which extruded raw rubber for application to used tires in a tire recapping process. I find the result in that case highly questionable and I have some trouble placing the case in either of the two categories I have identified. However, the correctness of *AMF* is not before us.